# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA

|  |  |  |
|---|---|---|
| **MAYDAY HEALTH** and **NANCY TURBAK BERRY,** | * * * * | |
| *Plaintiffs,* | * * | 4:26-cv-04096-CCT |
| v. | * * | |
| **LARRY R. RHODEN,** Governor for the State of South Dakota, and **MARTY J. JACKLEY,** Attorney General for the State of South Dakota, in their official capacities, | * * * * | |
| *Defendants.* | * * | |

## DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Defendants Larry R. Rhoden and Marty J. Jackley, by and through their counsel Amanda J. Miiller, Grant M. Flynn, Jacob R. Dempsey and Paul S. Swedlund hereby file this response to plaintiffs' motion for a preliminary injunction. Mayday's motion fails for the plain and simple reason that the First Amendment does not protect speech which solicits or facilitates an illegal abortion. Here, as in the New York litigation, not even Mayday's own authorities support their legal arguments. Here, as in the New York litigation, Mayday supports its tenuous arguments with cherrypicked bits of *dicta* from cases whose actual holdings *harm* their case. Here, as in the New York litigation, Mayday has no likelihood of succeeding on the merits of its claims.

## INTRODUCTION

Our federal system of government exists to respect the social and cultural differences between states. In Mayday's home state of New York, abortion is accepted; in South Dakota it is not. As observed in *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215, 217 (2022), "the people of the various states may evaluate [abortion] interests differently." South Dakota is not New York.

Mayday claims simply to "help" those in search of medical information, which may be true as applied to some of its activities in states like New York where abortion is legal, but Mayday's "help," particularly the means it employs to "help," is something altogether different as applied to states where abortion is illegal. In a state like South Dakota, which has laws against abortion and abortion drugs, Mayday's "help" violates the state's criminal laws. Which is precisely why Mayday targets its activities toward abortion-illegal states – to aid and abet women[1] and abortion drug merchants to skirt South Dakota's laws.

Abortion is a divisive issue that unavoidably colors one's views of laws which permit or prohibit it. Americans strongly disagree about abortion. But almost nobody disagrees that child pornography or sexual intercourse with children is wrong. So, to put the matter in stark perspective, if Mayday's website were directed toward connecting pedophiles with child pornography or children in the same way it connects buyers with sellers of abortion drugs, nobody could seriously contend it had a First Amendment right to do so. *United States v. Williams,* 553 U.S. 285 (2008)(finding no First Amendment right to advertise and facilitate transfers of child pornography). Nobody could seriously contend that a state does not have the absolute right to shut down advertising that is a conduit to platforms that supply child pornography or children to pedophiles, or sex-trafficked women to pimps, or contract killers to bitter ex-husbands, or methamphetamine to addicts. Though Mayday obviously does not see it in such terms, to South Dakota and South Dakotans the state has the same interest in keeping unborn children from the hands of abortionists as it does in keeping born children from the hands of pedophiles. It is a core

---

[1] An assumption underlies Mayday's business model that every woman who makes abortion inquiries wants an abortion. There is abundant data that in a statistically significant number of cases, women are being pressured into abortions by male partners, family members, or economic circumstances. But it does not "help" a woman to facilitate an abortion she does not want. These dynamics in abortion decision making reveal that Mayday's premise of "helping" all women who log onto its cite is not categorically true.

social and cultural value of South Dakotans which our federal system recognizes, respects and protects.[2]

So, it is necessary to scrutinize the means Mayday employs to "help" South Dakota women in order to exercise informed judgment about the laws the state is enforcing here.

**MAYDAY'S WEBSITE**

In early December 2025, Mayday posted this placard at gas stations throughout South Dakota:



KLEMANN AFFIDAVIT, Exhibit 1 at Exhibits A, B.  At a press conference, Mayday crowed that it was targeting South Dakota for this advertising campaign "due to the state's strict abortion laws."

---

[2] Mayday makes much of some *dicta* in Judge Failla's *Younger* ruling to the effect that she would have ruled in Mayday's favor on the merits if she had had jurisdiction.  Judge Failla's comments are *dicta* because a federal court's function at the *Younger* stage is not to adjudicate the actual merits of the moving party's First Amendment defense because the federal court does not have the evidence and record that the state court will have.  A federal court's function at a *Younger* hearing is simply to evaluate whether the state brought its enforcement action in bad faith.  Bad faith exists if the state brought its enforcement action without "reasonable hope" of success.  *Perez v. Ledsma,* 401 U.S. 82, 84 (1971).  Because bad faith, not the merits of Mayday's First Amendment defense, was the only issue before the court, Judge Failla's comments are *dicta* because they were "unnecessary for a decision on the merits" of South Dakota's bad faith defense.  *State v. Moeller,* 2004 SD 110 at ¶44 n. 4; *United States v. Bell,* 527 F.2d 202, 206 (defining *dicta* as an "an unnecessary extension of comments" beyond what is needed to decide a case.  Moreover, Judge Failla's comments contradict her ruling on bad faith, which necessarily found that the state had a "reasonable hope" of succeeding in defending its enforcement action against a First Amendment attack.  Thus, to the extent the merits of Judge Failla's *Younger*/bad faith ruling have any application here, it would be for the proposition that the state, not Mayday, has a "reasonable hope" of success in this case, which rules out Mayday's request for a preliminary injunction.

KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit B.  Mayday's advertisements directed South Dakota consumers to its website at MAYDAY.HEALTH.

Mayday's website solicits charitable donations from consumers and sells merchandise with a misleading statement regarding the availability of abortion pills "in all 50 states."  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibits C, D.  According to Mayday, it is "entirely funded by donations and merchandise sales."  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit E.

When a woman enters the MAYDAY.HEALTH website, there is a large headline on the home page that asks "What do you need?"  Below that are four clickable links to choose from: abortion, morning after pills, birth control, and gender-affirming care.  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit J.  If a woman selects "abortion," she is taken to a new screen that lists five separate abortion pill providers, four of whom Mayday informs the viewer "SHIP[] TO ALL 50 STATES."  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit K.  If a woman clicks on the links to these abortion drug merchants they are informed that they will prescribe drugs via telemedicine and send them to South Dakota.  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit K.  If a woman is curious if these providers can legally mail abortion drugs into her state, Mayday's FAQ page informs her that "[s]hield laws" protect doctors "in abortion friendly states who prescribe and send abortion pills to people living in other states that ban . . . abortion."  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit K.  This fails to inform woman in South Dakota that these "shield laws" do not change the fact that the transaction she is about to enter and the abortion she contemplates inducing are illegal under state law.  This non-answer makes a woman think medicinal abortion is legal in South Dakota, which denies her the choice of whether to have an *illegal* abortion or not.

Mayday's website features a chatbot named Charley who is a font of false and misleading information and illegal advice.  Charley pops on the screen asking women if they want help getting an abortion.  KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit J.  Charley assures women that the

4

conversation is private and asks if she needs help with two options: 1) abortion info or 2) am I pregnant. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit L. If a woman clicks on abortion info, Charley informs her that there are two main types of abortion – pills and procedures – and assures her that both are "generally very safe and effective for ending a pregnancy." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit M.

Charley asks a woman if she knows what type of abortion she is interested in and provides three options: 1) Get Started; 2) Pills; and 3) Procedure. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit P. Charley tells women that her "abortion options will depend on [her] location and asks her to type in her location. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit LL. If she types in Rapid City, South Dakota 57701, Charley tells her that, though "clinics aren't allowed to do abortions in South Dakota," a woman "still ha[s] options." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit MM. A woman who elects to continue the conversation is then told that abortion pills are "available to [her]." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit NN. Charley will then ask if she wants "a link to a telehealth provider to get pills now" or whether she wants more information. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit Q. If she clicks on pills, Charley then tells her that "abortion pills work best for people less than 13 weeks pregnant" and asks her the date of her last period. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit R. If a woman who logged in on June 15, 2026, tells Charley that the date of her last period was April 1, 2026, Charley tells her that Aid Access, an abortion pill provider, "ships pills to people in all 50 states for $150 or less." KLEMANN AFFIDAVIT, Exhibit 1 at ¶ 31, Exhibit U. With no mention of the associated risks, Mayday's website informs women that "abortion pills are safe [and] effective during the first 12 weeks of pregnancy." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit DD. However, The FDA's warnings concerning the use of abortion-inducing drugs caution that they

carry risks of bacterial infection, rare cases of fatal septic shock, and uterine bleeding that "[i]n about 1 out of 100 women . . . can be so heavy that it requires a surgical procedure" to stop.[3]

Charley does not inform a woman that it is not just "clinics [that] aren't allowed to do abortions in South Dakota." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit MM. Charley does not inform women that medicinal abortions also "aren't allowed." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit MM. Charley instead tells a woman that she "still ha[s] options" and that abortion pills are "available to [her]," again without informing her that it is illegal. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit MM, NN.

If a woman clicks on Mayday's website link to Aid Access, she learns that Aid Access is willing to send abortion pills through the mail to South Dakota. Aid Access has a South Dakota specific page that does not inform a woman that it is illegal to mail abortion-inducing pills to South Dakota or that is illegal in South Dakota to obtain a medicinal abortion via telemedicine. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit BB. On Aid Access' FAQs page, Aid Access' response to the question "Is it legal?" tells a woman that "[p]eople needing and having abortions in the USA are not breaking the law in any state!" KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit CC. Though it is frequently asked if mailing abortion drugs to South Dakota is legal, neither Mayday nor Aid Access (or any other Mayday affiliate) ever give a straight answer, instead they provide evasions or bald-faced lies. Aid Access informs a woman that she is able to self-induce an at-home abortion using abortion pills up to the fourteenth week of her pregnancy, and that this is "very safe." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit Z. The FDA issued warning letters

---

[3] U.S. Food and Drug Administration, Labeling Information for Mifepristone, https://www.accessdata.fd.gov/drugsatfda_docs/label/2023/0206870rig1s025Lbl.pdf#page=16 (last visited December 21, 2025). KLEMANN AFFIDAVIT, Exhibit A at Exhibit 31.

to Aid Access for selling unapproved and misbranded abortion-inducing pills (Mifepristone and Misoprostol) over the internet. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit AA.

If a woman clicks on Mayday's website link to Abuzz, she is prompted to identify the state in which she resides. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit V. If a woman selects South Dakota she is provided a link to "information about the potential legal risks of getting abortion pills by mail" in South Dakota. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit W. Abuzz does not require a woman to click on this "information" link to purchase abortion drugs, but if she does she is taken to a new website, plancpills.org. KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit X.

Instead of advising a woman that it is illegal to mail abortion pills to South Dakota, plancpills.org evasively tells her that "hundreds of thousands of people have received and used pills by mail over the past few years with no legal problems." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit Y. Under the heading "How do people get in trouble" for using abortion pills, plancpills.org advises women get in trouble only if "they told someone about their abortion and that person reported them; they got follow-up medical care and the provider reported them (many people say they are having a miscarriage to avoid this risk, which is medically what is happening in the body); [or] they were later in pregnancy than they thought and didn't know what to do with the fetal tissue." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit Y.

Mayday's dissembling "dissident" advertising campaign to supply abortion drugs "in all 50 states" regardless of state law flagrantly flouts SDCL 22-17-5.3's prohibition on advertisements for drugs for the purpose of producing an unlawful abortion in South Dakota. Mayday clearly intends for the pills its sends to South Dakota to be ingested in, and produce an abortion in, South Dakota. There would be no purpose in sending the pills to South Dakota otherwise. If a woman is having pills sent to her in South Dakota, it is not for the purpose of then traveling to an abortion-legal state to ingest the pills and induce an abortion where it is legal; the woman could just acquire

the pills herself in the abortion-legal state when she got there.  The *only* purpose in sending abortion drugs to South Dakota is to produce an unlawful abortion there.  Indeed, Mayday's complaint freely admits that the intent of its "advertising" is to "help" women "terminate pregnancies safely even though they live in places like South Dakota that limit or outlaw abortion."  DOCKET 1 at ¶ 6.

**ARGUMENT**

Mayday is not entitled to preliminarily enjoin a duly enacted state criminal law because it cannot demonstrate a likelihood of succeeding on the merits of its First Amendment claims.  Mayday's website and messaging simply are not, as they claim, *Bigelow, Matsumoto* or *James* protected under the First Amendment, or immunized by the Communications Decency Act, because they actively solicit and facilitate commercial transactions and conduct that are illegal within the borders of the State of South Dakota.

The standard governing a motion for preliminary injunction requires Mayday to demonstrate (1) a likelihood of success on the merits, (2) irreparable harm, (3) balance of equities in its favor, and (4) public interest.  *Planned Parenthood Minnesota, North Dakota and South Dakota v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008)(*PPMNS*).  Where, as here, the plaintiff seeks to enjoin a state criminal statute, the court must apply a more rigorous standard regarding the likelihood of success factor.  The plaintiff "must demonstrate more than just a fair chance that it will succeed on the merits" and instead must meet "a more rigorous threshold showing that the movant is likely to prevail on the merits."  *PPMNS*, 530 F.3d at 730.  This heightened threshold "ensures that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis."  *PPMNS*, 530 F.3d at 733.  Mayday cannot meet these rigorous standards under the circumstances of this case.

### A. First Amendment

Mayday first seeks shelter in the First Amendment. But the First Amendment provides no protection for Mayday's active solicitation and facilitation of illegal conduct.

### 1. Likelihood Of Success On The Merits

Mayday is not likely to succeed on the merits of its First Amendment claims because its website is at best a mix of commercial and non-commercial speech and at worst speech integral to the commission of a crime. The former is afforded nominal First Amendment protection while the latter is afforded no protection at all. As commercial speech integral to the commission of a crime in the state of South Dakota, Mayday's website is doubly unprotected by the First Amendment.

### i. Speech Integral To Criminal Conduct

Despite protections afforded First Amendment speech, even certain commercial speech, speech that proposes an illegal transaction or is in furtherance of a criminal scheme receives no protection. Thus, *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973), held that there was "no doubt that a newspaper constitutionally could be forbidden to publish a want ad . . . soliciting prostitutes." As speech in furtherance of an illegal commercial transaction in South Dakota, *i.e.* purchase of abortion pills, Mayday's speech is entirely unprotected, as Mayday's own cited cases prove.

In *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 495 (1949), the court examined whether picketers could be restrained from protesting outside a business with the intent to force the business to engage in an illegal restraint on trade. *Giboney* ruled that the picketers' protest was not protected speech because "placards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control." *Giboney,* 336 U.S. at 502. The *Giboney* court saw that, if not restrained, "[t]here was clear danger, imminent and immediate, that . . . [the picketers] would succeed in making [state laws against

9

restraints in trade] a dead letter." *Giboney,* 336 U.S. at 503.  The right to protest, *Giboney* found, could not be extended "to speech or writing used as an integral part of conduct in violation of a valid criminal statute."  *Giboney,* 336 U.S. at 498.  Thus, when the picketers' "placards were to effectuate the purposes of an unlawful combination [in trade], and their sole, unlawful, immediate objective was to induce [the picketed business] to violate [state] law" against restraints in trade, the picketers could not expect First Amendment protection for their activities.  *Giboney,* 336 U.S. at 502.

Since *Giboney,* the speech-integral-to-criminal-conduct (SITCC) exception has been extended to advertising for child pornography (*Williams*), prostitution (*Pittsburgh Press*), illegal immigration (*Hansen*), tax evasion (*White, Bell*), marijuana (*Conant, Cocroft*), and . . . illegal abortion (*Matsumoto, Welty*).  Generally speaking, advertising loses First Amendment protection under the SITCC exception when it crosses the line between "mere advocacy" and "inciting or producing an imminent lawless [trans]action."  *Brandenburg v. Ohio,* 395 U.S. 444, 447-449 (1969).  When exactly this line is crossed has been variously described as:

***United States v. Williams,* 553 U.S. 285, 293, 295-295, 295 (2008)(Child Pornography)**

- "collateral speech that introduces [child pornography] into the child pornography **distribution**;"

- "**recommending** purported child pornography to another person for his **acquisition**;"

- speech that "accompan[ies] or seek[s] to **induce the transfer** of child pornography from one person to another;"

- "**offers to give** or receive what is unlawful to possess;"

- "**offers to provide** or requests to obtain unlawful material, **whether as part of a commercial exchange or not**;"

- "recommend[ing] . . . a particular piece of purported child pornography with the intent of **initiating a transfer**;"

***United States v. Hansen,*** **599 U.S. 762, 775, 782, 783 (2023)(Illegal Immigration)**

- "that a defendant *intend* to bring about a specific result;"

- "'encouraging' and '**inducing**' a *violation of law*;"

- "[s]peech **intended to bring about a particular unlawful act**."

***United States v. Al-Timimi,*** **2026 WL 71062, \*7-\*9 (4ᵗʰ Cir.)(Terrorism)**

- "recommend[ing] . . . how or when" specific illegal acts might be performed.

***Conant v. Walters,*** **309 F.3d 629 (9ᵗʰ Cir. 2002)(Marijuana)**

- advertising which doubles as "as a **means for obtaining** marijuana, as a prescription is used as a **means . . . to obtain** a controlled substance."

***United States v. Arthur,*** **160 F.4ᵗʰ 597, 608 (4ᵗʰ Cir. 2025)(Bomb Making)**

- "teach[ing] another to make 'explosive[s]' . . . while *knowing* that the recipient of that information **intends to use it** to commit a federal crime of violence"

- when "but for the proscribed communications, the other person would lack the **means to commit** their intended crime."

According to these authorities, Mayday's "advertising" crosses the line because – with the stated intent to procure and produce abortions "in places like South Dakota" – it:

- offers to provide abortion pills whether as part of a commercial transaction or not (*Williams*);

- accompanies its advertising with inducements to transfer of child abortion drugs from one person to another (*Williams*);

- recommends abortion drug suppliers with the intent of initiating a transfer (*Williams*);

- encourages and induces a violation of the law (*Hansen*);

- intends to bring about a particular unlawful act (*Hansen, Arthur*);

- recommends how (by mail) and when (within a certain number of weeks post-LMP) illegal abortion drug acquisition and ingestion be done (*Al-Timimi*);

- furnishes the means for obtaining illegal abortion drugs (*Conant, Arthur*).

The fact that Mayday acts as a middleman to these transactions does not remove its "advertising" from the SITCC exception, just as the fact that the newspaper in *Pittsburgh Press* was just a middleman between the women solicited and the men soliciting did not protect a want ad promoting prostitution. *Pittsburgh Press*, 413 U.S. at 388.

Mayday's own authorities affirm that its "advertising" is unprotected per the SITCC exception. Mayday inexplicably continues to rely on *Bigelow v. Virginia*, 421 U.S. 809, 826 (1975), and *Nat'l Inst. of Family and Life Advocates v. James,* 160 F.4th 360 (2nd Cir. 2025), even though those cases do not help Mayday's case at all. If *Bigelow* and *James* are the best Mayday can come up with, then it has effectively conceded that the First Amendment affords its "advertising" no protection whatsoever.

All that *Bigelow* says is that Virginia law enforcement could not exercise its "internal police powers" to enjoin a Virginia newspaper from advertising that abortion was legal in New York. *Bigelow*, 421 U.S. at 824-825. If Mayday's message was simply "Abortion is legal in Minnesota and here is a list of clinics that provide it," then *Bigelow* would be controlling. But the *Bigelow* rule only extends to an "advertiser who proposes a transaction in a state where the transaction is legal." *Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 691 (9th Cir. 1984). Here, however, Mayday is advertising and facilitating a transaction in a state where that transaction is not legal.[4] *Bigelow* does not afford First Amendment protection to Mayday for proposing and facilitating a transaction that is illegal in South Dakota in furtherance of an act that is illegal in South Dakota. *Bigelow*, 421 U.S. at 828.

---

[4] Products that are "transferred electronically, or services for delivery into South Dakota" are sales consummated within the State of South Dakota and "treated as a local transaction" for jurisdictional purposes. *South Dakota v. Wayfair,* 585 U.S. 162, 177-178 (2018); *Bates v. State Bar of Arizona*, 433 U.S. 350, 378 (1977)(putting up an advertisement is "penetrating a market").

Likewise, *James* does not help Mayday's cause here despite some surface similarities.  In *James,* the New York Attorney General had brought an enforcement action against Heartbeat International to enjoin allegedly misleading statements concerning the efficacy of so-called abortion reversal pills.  *James,* 160 F.4th at 365.  The National Institute of Family and Life Advocates (NIFLA) proactively brought suit to enjoin James from targeting its abortion reversal pill advocacy as it had HBI's.  Like Mayday, NIFLA provided referrals to abortion reversal pill providers.  The district court granted NIFLA's request for an injunction.  But despite the surface similarities to this case, *James* does not support the imposition of an injunction here.

NIFLA's activities, though similar, were materially different from Mayday's activities here.  For one thing – and it is a big thing – the abortion reversal pill is not illegal in New York.  For another, the *James* court found that NIFLA's speech was non-commercial because "there [wa]s no evidence in the record . . . to suggest that the NIFLA plaintiffs gain other types of economic benefits by engaging in this speech, such as an increased customer base or a capital increase through fundraising." *James,* 160 F.4th at 377.  If Mayday's message was simply about a *legal* medication and it did not fundraise off its illegal advertising, then *James* might be controlling. *James,* 160 F.4th at 374 (speech that "is an advertisement, makes reference to a specific product, and the speaker has an economic motivation for the communication, is properly characterized as commercial speech").  So, to the extent *Bigelow* or *James* are controlling, they are not controlling for any proposition that helps Mayday place its messaging outside the SITCC exception.

The same is true of *Matsumoto v. Labrador,* 122 F.4th 787 (9th Cir. 2024), which, even more than *Bigelow* and *James*, strips Mayday's advertising of any pretense of legality. *Matsumoto* enjoined an Idaho statute against "recruiting" a minor to obtain an abortion. *Matsumoto,* 122 F.4th at 808. *Matsumoto* entered the injunction because Idaho's statute, in addition to in-state abortions, prohibited "procurement of abortions that are legal [in states] where they are performed."

*Matsumoto,* 122 F.4th at 813.  Idaho's statute explicitly provided that "[i]t shall not be an affirmative defense to a prosecution . . . that the abortion provider or the abortion-inducing drug provider is located in another state,'" which was intended to criminalize recruiting a minor to obtain an abortion in neighboring Oregon where abortion is legal.  *Matsumoto,* 122 F.4th at 813. In other words, Idaho's statute broadly criminalized speech which *Bigelow* expressly protects, *i.e.* speech concerning legal abortions in other states.

But for a statute like South Dakota's, which (as discussed in connection with overbreadth below) is limited to advertisements for procuring or producing an abortion in South Dakota, *Matsumoto* endorsed Idaho's argument that "recruiting an Idaho minor to get an illegal abortion in Idaho qualifies as speech integral to criminal conduct" and that "'recruiting' under [Idaho's statute], to the extent that it induces a minor to violate [that statute] via the adult's procurement of abortion for that minor, would be speech integral to criminal conduct."  *Matsumoto,* 122 F.4th at 813.  As in *Matsumoto,* Mayday's advertising instructing and facilitating a South Dakota woman on how "to get an illegal abortion in [South Dakota] qualifies as speech integral to criminal conduct."  *Matsumoto,* 122 F.4th at 813.  Under the circumstances, *Matsumoto* helps the state defendants far more than it helps Mayday.

And contrary to Mayday's assertion that *Welty v. Dunaway,* 791 F.Supp.3d 818, 831, 839 (M.D.Tenn. 2025), "struck down a law making it a crime to 'intentionally recruit . . . a pregnant unemancipated minor . . . for purposes of obtaining an abortion that would be illegal in Tennessee,'" *Welty* actually says the exact opposite.  *Welty* struck down the Tennessee statute because – in contravention of *Bigelow* and like *Matsumoto* – it also "bar[red] recruitment of minors to facilitate abortions 'regardless' of where the procedure occurs.  In other words, the [Tennessee] law prohibit[ed] recruiting an out-of-state abortion that is entirely *legal* in that state."  *Welty,* 791 F.Supp.3d at 826.  As discussed on connection with overbreadth below, South Dakota's abortion

14

advertising ban does not – unlike Tennessee's (or Idaho's in *Matsumoto*) – extend to advertising the availability of abortion or abortion drugs in states where it is legal.  Nor is Mayday's advertising in South Dakota even directed at, or limited to, informing women where it is legal to purchase and ingest abortion pills or otherwise obtain an abortion.  Mayday's advertising is directed solely at initiating transactions to ship abortion pills into "places like South Dakota" for the purpose of inducing an abortion there.

Thus, *Welty*, like *Matsumoto*, holds unequivocally that a "state may constitutionally punish speech made in direct furtherance of in-state abortions."  *Welty,* 791 F.Supp.3d at 831.  If, unlike Mayday, a pro-abortion group "promote[s] only legal abortions, the speech integral to crime exception does not apply and [the group's] speech remains protected."  *Welty,* 791 F.Supp.3d at 831.  But if, as here, the speech promotes illegal abortions, the SITCC exception applies and Mayday's speech is unprotected.  *Welty,* 791, F.Supp.3d at 831.  Thus, *Welty* supports South Dakota's position that advertising "to procure an illegal abortion [in South Dakota] is speech integral to criminal conduct."  *Welty,* 791 F.Supp.3d at 839.

Mayday's own cases – *Bigelow, James, Matsumoto, Welty* – affirm that its "advertising" is unprotected speech integral to criminal conduct.  Mayday's advertising "further[s] a criminal scheme in [South Dakota]" in contravention of *Bigelow*.  *Bigelow,* 421 U.S. at 828.  Mayday is peddling an illegal drug in contravention of *James*.  *James,* 160 F.4th at 377.  Mayday advertises for the "procurement of abortions that are [il]legal where they are performed."  *Matsumoto,* 122 F.4th at 813.  Mayday's advertising is "in direct furtherance of in-state abortions."  *Welty,* 791 F.Supp.3d at 831.  Mayday cannot possibly succeed on the merits when the very authorities it cites blast its case out of the water.

### ii. Overbreadth

Unlike in *Matsumoto* and *Welty,* Mayday is not likely to succeed in demonstrating that South Dakota's advertising ban is unconstitutionally overbroad.  A court can be constrained from enjoining speech which would otherwise be unprotected under the SITCC exception if the statute prohibiting it is overbroad.  *Hansen,* 599 U.S. at 770.  Overbreadth occurs when, in addition to the speech it lawfully proscribes, a statute "criminalizes a substantial amount of protected expressive activity."  *Arthur,* 160 F.4th at 606.  This requires a comparison and balancing of a statute's "plainly legitimate sweep" with the extent to which it "prohibits a substantial amount of protected speech." *Hansen,* 599 U.S. at 770; *Matsumoto,* 122 F.4th at 806.  The Idaho and Tennessee statutes in *Matsumoto* and *Welty* failed this test because those statutes were not limited to speech "recruiting" minors for illegal, in-state abortions; the Idaho and Tennessee statutes criminalized recruitment for an abortion *anywhere*, including where it was legal, which clearly violated *Bigelow.*

SDCL 22-17-5.3 does not commit this constitutional error.  SDCL 22-17-5.3 is expressly limited to advertising "for the purposes of an *unlawful* abortion pursuant to § 22-17-5.1."  This phrase limits the scope of the advertising ban in two ways the Idaho and Tennessee statutes did not.  First, it is limited to generally to "unlawful" abortions.  Second, it is limited specifically to abortions prohibited by SDCL 22-17-5.1, which is only abortion in the state of South Dakota. Unlike the Idaho and Tennessee statutes, SDCL 22-17-5.3 "reaches no further than the purposeful solicitation and facilitation of specific acts known to violate [South Dakota] law."  *Hansen,* 599 U.S. at 781.  Thus, "[t]o the extent [SDCL 22-17-5.3] reaches any speech, it stretches no further than speech integral to unlawful conduct" in South Dakota.  *Hansen,* 599 U.S. at 783.

Unlike the word "recruit," which *Matsumoto* found "has broad contours that . . . sweep in a large swath of expressive activities – from encouragement, counseling and emotional support; to education about available medical services and reproductive healthcare," "advertise" is used in

16

SDCL 22-17-5.3 in a narrow, transactional sense of "present[ing] (something or oneself) to the public in a way that is intended to attract customers." www.merriam-webster.com/dictionary/advertise. As used in SDCL 22-17-5.3, "advertise" means what *Williams* found it to mean – "offers to provide or requests to obtain" illegal material and "recommending [illegal material] to another person for h[er] acquisition" in conjunction with the means for such acquisition, which Mayday certainly provides. *Williams,* 552 U.S. at 294-295.

When "advertise" is so understood, SDCL 22-17-5.3's legitimate sweep – abortions in South Dakota – is plainly legitimate. But when it comes to showing that SDCL 22-17-5.3 "prohibits a *substantial* amount of protected speech," Mayday's side of the scale is empty. *Hansen,* 599 U.S. at 770. Unlike in *Bigelow,* Mayday's advertising does not simply inform viewers where abortion is legal or where abortion drugs may legally be purchased and ingested to produce an abortion, and to the extent it does it does not fall under SDCL 22-17-5.3. Mayday is a roadmap to abortion pill acquisition in places where such acquisition is illegal. In this respect Mayday's website is like manuals instructing readers on techniques for illegal tax evasion which courts have enjoined under the SITCC exception without thinking twice about it. *United States v. White,* 769 F.2d 511 (8th Cir. 1985); *United States v. Bell,* 414 F.3d 474 (3rd Cir. 2005). Mayday can no more instruct buyers on how to procure illegal abortion drugs in South Dakota than the defendants in *White* and *Bell* could instruct readers on how to evade taxes. Mayday's own authorities – *Bigelow, Matsumoto* and *Welty* – expressly state it may not do what it is brazenly doing – promoting illegal transactions and conduct within the state where such transactions and conduct are illegal.

Mayday brags that it "exists to provide . . . mail-order abortion pills . . . in all 50 states, regardless of harmful state restrictions." Mayday advertises abortion drugs for acquisition in "all 50 states." South Dakota is one of these "50 states" and Mayday advertises abortion drugs for acquisition in South Dakota for the purpose of producing abortion in South Dakota "regardless"

of the state's laws against it.  Mayday provides the means to procure such drugs by advertising for and linking viewers to abortion pill merchants whose stated intent is to ship abortion drugs to "all 50 states."  Mayday is simply a front to advertise for abortion pill merchants what they cannot advertise for themselves in South Dakota.  But the First Amendment does not allow abortion pill merchants to use Mayday to connect with women seeking abortion drugs any more than the pimps and Johns of *Pittsburgh Press* could use the newspaper to connect with women seeking to become prostitutes.  *Pittsburgh Press*, 413 U.S. at 388.  The First Amendment affords Mayday's brazen solicitation and facilitation of illegal abortion drug transactions no protection at all so, as in *Hansen,* its "side of the ledger [is] . . . pretty much blank."  *Hansen,* 599 U.S. at 782.

Mayday comes up empty handed when it comes to showing that SDCL 22-17-5.3 prohibits *any* protected speech let alone a *substantial* amount of it.  Mayday's speech is not *Bigelow, Matsumoto* or *Welty* protected because it is in furtherance of a transaction that is criminal within the borders of South Dakota which is well within the state's police powers to prevent.  *Bigelow*, 421 U.S. at 828 (1975); *Cocroft v. Graham,* 122 F.4th 176, 182 (5th Cir. 2024)(no protection for speech advertising illegal transaction within the enforcing state).  Mayday's speech is not *James* protected because the abortion reversal pills in *James* were not illegal in the state of New York and because NIFLA, unlike Mayday, had not monetized its message by fundraising off its advocacy for abortion reversal pills.  *James*, 160 F.4th at 379.  Accordingly, Mayday cannot demonstrate that it is likely to succeed on the merits of its claim that SDCL 22-17-5.3 is overbroad.

## 2. Irreparable Harm

While "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367, 1383 (2011), this is not true of unprotected speech integral to criminal conduct.  Even if speech is protected, courts have clarified that "the assertion of First Amendment rights does not

18

automatically require a finding of irreparable injury." *Time Warner Cable of New York City, L.P. v. City of New York*, 943 F. Supp. 1357, 1384-1385 (1996).  Irreparable harm requires Mayday to "show a chilling effect on free expression." *Time Warner*, 943 F.Supp. 1357, 1384-1385 (1996).  But this all presupposes a protected First Amendment interest.  Abortion drugs being illegal in South Dakota, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity . . . . [A state] may ban forms of communication . . . related to illegal activity."  *Central Hudson,* 447 U.S. at 563.

Mayday cannot demonstrate irreparable harm for two reasons.  First, placard or website advertising of illegal transactions is not entitled to protection in the first place.  Second, unlike in *James,* Mayday cannot demonstrate that its placards or website are purely vehicles for "their moral and religious beliefs, not based on any economic motivation."  *James,* 160 F.4th at 375.  Or, stated another way, Mayday cannot demonstrate that its speech is simply "informational, without any economic motivation."  *James,* 160 F.4th at 375.

Being a non-profit corporation does not mean that Mayday runs a non-profit website.  One need look no further than the DONATE page on Mayday's website to find its economic motivation for being a megaphone and platform for abortion pill providers.  According to Mayday, it is "entirely funded by donations and merchandise sales" so it can "reach more people" with information on "how to access abortion pills through the mail in all 50 states." KLEMANN AFFIDAVIT, Exhibit 1at Exhibit 7.  Mayday fundraises off its strident commitment to illegally export abortion to "all 50 states" regardless of state laws.  Donated funds pay overhead costs and salaries of Mayday's officers and directors (which can be handsome in "non-profit" organizations) which ensures the organization's continued existence, which is a form of economically benefitting from the activities it promotes.  As noted in *James,* the ability to increase exposure through fundraising is an economic motivation.  *James,* 160 F.4th at 377.  Likewise, per *First Resort, Inc.*

19

*v. Herrera,* 860 F.3d 1263, 1273 (9th Cir. 2017), Mayday's advertisements are commercial speech because they "directly relate to [Mayday's] ability to fundraise and, in turn, to buy more advertisements." Such speech, even if it were not integral to criminal conduct, would not be outside the bounds of legal proscription if done in furtherance of a legitimate state interest. *Herrera,* 860 F.3d at 1273. The bottom line is that Mayday cannot claim a First Amendment interest in facilitating illegal transactions and illegal abortions so it has not suffered the irreparable loss of any expression or activity to which it has any right.

### 3. Balance Of Equities/Public Interest

The balance of equities here clearly favors the state's interests in the health and safety of pregnant women, the life or potential life of the unborn, and promoting respect for human life at all stages of a pregnancy. *Planned Parenthood v. Casey,* 112 S.Ct. 2791, 2817 (1992); *Gonzales v. Carhart,* 127 S.Ct. 1610, 1626, 1643 (2007). In furtherance of these interests a "state may take measures to ensure that the woman's choice is informed" and adopt policies to encourage women "to choose childbirth over abortion." *Casey,* 112 S.Ct. at 2821, 2825. SDCL 22-17-5.3's advertising ban promotes the state's interests in informing women's abortion decisions and measures to achieve the ends of its pro-life statutes. *Abott v. Perez,* 138 S.Ct. 2305, 2324 n. 17 (2018).

However much Mayday might disagree with South Dakota's pro-life views, equity never favors illegal communications or conduct. As Mayday admits, it is engaged in "dissident" activity . . . which is just a euphemism for *illegal* activity. As Mayday admits, it sends abortion drugs to South Dakota "regardless of harmful state restrictions" . . . which is a euphemism for *in violation of state laws*. Such advertising is entitled to no protection at all let alone any form of heightened scrutiny.

20

South Dakota's experience with abortion pill importation evidences that Mayday's abortion pill advertising is a threat to public health.  Alpha Center in South Dakota is a non-profit, healthcare facility and clinic that provides pregnancy testing, ultrasounds, and STI testing for pregnant women who are experiencing an unplanned pregnancy.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 21.  Alpha Center also provides post-abortion care for women who have complications from surgical and medicinal abortion.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶22.  At-home, medically unsupervised abortion is not the risk free procedure Mayday and its affiliates portray it to be:

- One risk of medication abortion is serious and potentially fatal infections.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶10.

- Taking abortion pills can lead to excessive vaginal bleeding, which can be so severe that emergency medical treatment and blood transfusions are needed to save a woman's life.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶11.

- Additional risks include retained tissue and incomplete abortion, which causes the uterus to bleed and cramp and usually requires a surgical procedure because the cramping can cause hemorrhage.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶12.  In one such case, a female who took too much misoprostol experienced extreme and life-threatening hemorrhaging and a lacerated cervix, which required an emergency hysterectomy to save the woman's life.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶13.

Therefore, risk assessments are necessary before undergoing a medication abortion because it is vital for patient safety to know blood type, rule out ectopic pregnancy, and confirm fetal age via ultrasound.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶14.  Confirming fetal age is necessary because the rate of abortion medication failure or incomplete abortion reaches 38% in the second trimester.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶15.  Confirming fetal age is also necessary because a fetus

is significantly larger at 14 weeks than at 10 weeks and is more difficult to expel, which increases risks associated with retained products of conception. GIEBINK AFFIDAVIT, Exhibit 2 at ¶16. Yet, despite these risks the abortion drug merchants whom Mayday sponsors and to whom Mayday directs women provide abortion medications to women in their second trimester with statements that they can be safely taken up to 14 weeks. GIEBINK AFFIDAVIT, Exhibit 2 at ¶18.

Since 2024, medication abortion incidents have become increasingly prevalent in South Dakota from women obtaining abortion pills online without appropriate risk assessments and then ingesting the pills at home without proper medical supervision. GIEBINK AFFIDAVIT, Exhibit 2 at ¶24. Alpha Center's experience challenges Mayday's unqualified message that medicinal abortion is safe.

a. One case involved a male who had impregnated a patient and ordered abortion pills online. This individual slipped the pills into the patient's drink without her knowledge. The patient sought abortion pill reversal treatment after ingesting the mifepristone. GIEBINK AFFIDAVIT, Exhibit 2 at ¶25.a.

b. In another case, a male ordered abortion pills online on behalf of a patient. This individual entered all the information required by the website and ordered the abortion pills, then gave them to the patient, who took them consensually. The patient sought post-abortion care at Alpha Center due to excessive blood loss. GIEBINK AFFIDAVIT, Exhibit 2 at ¶25.b.

c. In another case, a patient purchased abortion pills through Aid Access, a pill merchant hosted on MAYDAY.HEALTH. The pills were sent to the patient's address in South Dakota. The patient contacted Alpha Center with questions about the pills before taking them. After consulting with Alpha Center medical staff, the patient opted not to take the pills. GIEBINK AFFIDAVIT, Exhibit 2 at ¶25.c.

d. In another case, a minor patient who obtained abortion pills online without parental knowledge or consent took the pills and had to seek emergency medical care due to excessive blood loss.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 25.d.

e. In another case, a patient obtained abortion pills from the MAYDAY.HEALTH-hosted provider Aid Access while 15 weeks pregnant.  The FDA has not approved abortion pills for safe usage in pregnancies past 10 weeks gestation.[5]  This patient ultimately elected to not take the abortion pills.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶¶ 17, 25.e.

f. In another case, a 12-weeks pregnant patient took abortion pills acquired online and expelled the fetal tissue at home.  One of the patient's relatives called with concerns about the patient's excessive blood loss.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 25.f.

g. In two cases, patients were told by an abortion pill merchant to falsely report to medical staff that they were was experiencing a miscarriage if they needed emergency post-abortion medical care.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 25.g.

h. In another case, a patient was given instructions by Aid Access to lie and say she was having a miscarriage in the event she sought emergency medical care after taking medicinal abortion pills.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 25.h.

These cases show that the number of patients seeking emergency care at the Alpha Center for adverse medical events related to abortion pills is increasing in South Dakota.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 26.  These cases also show that abortion pills are increasingly being shipped into South Dakota via mail services, and this is made possible due in part to Mayday advertising on behalf of the pill merchants.  GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 27.  Of

---

[5] U.S. Food and Drug Administration, *Information About Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation,* https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (last visited December 21, 2025).

particular concern is Mayday's advice to women and teenaged girls to conceal that they have ingested the abortion pill if they need follow-up care for abortion complications. Misrepresenting to a physician that the patient is experiencing a miscarriage when in fact she is having a medical emergency secondary to abortion pill ingestion can lead to complications in treatment. GIEBINK AFFIDAVIT, Exhibit 1 at ¶25.i. In the face of these facts, Mayday cannot claim that the equities or public interest favor its misleading and life-threatening medical advice.

### B.  Commercial Decency Act

Mayday cannot establish at this time that it is likely to succeed on the merits of its Commercial Decency Act (CDA230) defense. CDA230(c)(1) generally immunizes an "interactive computer service" (Service Provider) from third-party content published on its site. This immunity does not extend to an "internet content provider" (Content Provider). Importantly, a Service Provider can become a Content Provider, or be both, under CDA230 if it creates its own content in aid of the service it provides. *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 640 (4th Cir. 2025).

The erroneous premise of Mayday's CDA230 argument is that it is just a Service Provider. First, even if true, CDA230 only immunizes a Service Provider for the *third-party* content it hosts; it does not immunize a Service Provider for its *own* content. *Calise v. Meta Platforms,* 103 F.4th 732, 744 (9th Cir. 2024). Second, Mayday's website contains a great deal of content in aid of the service it provides to its third-party affiliates, which makes it both a Content and Service Provider. But it is not necessary at this juncture to determine if and to what extent Mayday is responsible for third-party content on its website because, as described in Kayla Klemann's affidavit, the content of Mayday's *own* website is enough to violate SDCL 22-3-3, 22-4A-1 and 22-17-5.3. KLEMANN AFFIDAVIT, Exhibit 1 at ¶¶ 15-34.

Imagine a woman approaching a real live Chatbot Charley on the corner of Mayday and Main Streets. She mentions she wants an abortion but "clinics aren't allowed to do abortions in

South Dakota." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit MM. Chatbot Charley tells her this is not a problem, tells her she "still ha[s] options." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit MM. Chatbot Charley tells the woman he can hook her up with a friend who provides abortion "pills to people . . . for $150 or less." KLEMANN AFFIDAVIT, Exhibit 1 at ¶ 31, Exhibit U. Chatbot Charley tells her that his friend will make these pills "available to [her]" and offers to introduce her to his friend so she can "get pills now." KLEMANN AFFIDAVIT, Exhibit 1 at Exhibit NN, Q. Chatbot Charley takes the woman to his friend's house. She walks up on the porch, knocks on the door while Chatbot Charley waits on the sidewalk. Chatbot Charley's friend takes her money and gives her abortion drugs. Chatbot Charley never touches the drugs or the money. But if Chatbot Charley were a real live streetcorner drug pusher operating in this fashion, there would be no argument that he could be prosecuted for soliciting and facilitating a violation of SDCL 22-17-5.3. Legally, there is no distinction between the actions of the real Chatbot Charley and the virtual Chatbot Charley. So, since virtual Chatbot Charley is a figment of Mayday's *own* content, not a third-party affiliate's, Mayday is not likely to succeed on the merits of the we're-just-a-Service-Provider component of its CDA230 defense. *Calise,* 103 F.4th at 744.

Moreover, there are facts which need to be developed which preclude any accurate current assessment of the likelihood of Mayday succeeding on the third-party component of its CDA230 defense. It is unknown at this time if and to what extent Mayday might collude with its affiliates and influence the content of their websites "in whole or in part," which could render Mayday liable for the third-party content on its website. *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167–1168 (9th Cir. 2008). Thus, in *National Association of the Deaf v. Harvard University,* 377 F.Supp.3d 49, 69 (D.Mass. 2019), a court denied summary judgment on Harvard's assertion of a CDA230 defense where there were questions about whether Harvard was "not in some measures a content provider as to information on its platforms that

25

originate[d]" from affiliates.    *Harvard University,* 377 F.Supp.3d at 69.    There are other evidentiary questions raised by *Calise* and *Roommates.Com* concerning whether Mayday's content is neutral or rather directed toward facilitating illegal preferences which may defeat the third-party component of its CDA230 defense.    *Calise,* 103 F.4th at 746; *Roommates.com, LLC*, 521 F.3d at 1169.    While Chatbot Charley alone suggests that it is not, as *Harvard University* found, it is "premature" at this point to assess Mayday's likelihood of succeeding on the merits of the third-party component of its CDA230 defense.    *Harvard University,* 377 F.Supp.3d at 69.

**CONCLUSION**

Imagine placards in the state of South Dakota, at gas stations or grocery stores or other places in the public eye that read:

> *They don't want*
> *you to know this:*
> ### You can still get
> ## METHAMPHETAMINE
> *in all 50 states*
> **LEARN MORE AT METHDAY.HIGH**

Then imagine that the purveyor of this advertisement's website extolled the virtues of methamphetamine, mocked states for criminalizing it, promised to provide it regardless of its illegality, told the public who sells it and what it costs, and initiated mail-order drug transactions through links to out-of-state pushers.    Would anyone seriously argue that such a racket does not illegally solicit and facilitate the sale of methamphetamine?    The public, law enforcement, the courts would not sit still and allow such a racket to operate.    The fact that the drug in question here is an abortion pill and not methamphetamine makes no difference; all that matters is that both drugs are illegal in South Dakota.

26

Mayday's "dissident' mentality has hatched a persecution complex where it believes South Dakota is "targeting" it for its beliefs on abortion.  COMPLAINT, Docket 1 at ¶¶ 28, 30; INJUNCTION MEMORANDUM, Docket 4 at 3, 6, 8, 14, 18.  One can look to the state's indifference toward groups who *legally* spread pro-abortion messaging in South Dakota to see that this is not true.  The Justice Empowerment Network (JEN), like the advertisement in *Bigelow,* informs women where abortion is legal and even assists them with travel to states where abortion is legal.  https://www.jensd.org/.  Unlike Mayday, so far as the Attorney General is aware, JEN does not promote abortion pill usage in South Dakota or provide links to abortion pill providers to mail abortion drugs into the state or otherwise propose or facilitate any activity within South Dakota's borders that is illegal in South Dakota.  The South Dakota Attorney General has taken no steps to enjoin JEN's *Bigelow*-protected activity on behalf of legal out-of-state abortions. Unlike JEN, Mayday's activity is not *Bigelow* protected.

Mayday has been "targeted" because Mayday alone solicits women and abortion drug merchants to violate SDCL 22-17-5.1 and -5.3 with the intent to disseminate, distribute and/or sell abortion drugs to produce an abortion in the state of South Dakota in violation of SDCL 22-4A-1. Mayday alone aids and abets women and abortion drug merchants in planning and committing the crimes of disseminating, distributing and/or selling abortion drugs to produce an abortion in the state of South Dakota in violation of SDCL 22-3-3.  Mayday is not "targeted" because of some thoughtcrime stemming from its moral convictions, but because of its "in-your-face" solicitation and facilitation of illegal drug transactions and illegal abortions within South Dakota's borders. MS. ARTICLE, Exhibit 3.  If Mayday had its way, its message would be plastered on gas pump placards, semi-tractor trailers, airplane banners, billboards and any other surface it could commandeer.  MS. ARTICLE, Exhibit 3.

27

Mayday's motion for a preliminary injunction is bereft of any supporting authority. South Dakota's solicitation and facilitation statutes do not require that Mayday personally "sell, handle, provide, offer for sale, or distribute" abortion drugs or that it "charge money or receive valuable consideration" for doing so. As noted in *Williams,* "it would be an odd constitutional principle that permitted the government to prohibit offers to sell illegal drugs, but not offers to give them away for free." *Williams,* 553 U.S. at 299. Many crimes can be committed without the solicitor or aider and abettor getting his hands dirty. This court need only find that Mayday's "advertising" is integral to the commission of crimes in South Dakota to find that it solicits in violation of SDCL 22-4A-1 and aids and abets in violation of SDCL 22-3-3 and so is altogether unprotected. For this, this court need look no further that the Giebink affidavit to find proof of Mayday's integral role in importing abortion drugs into South Dakota. GIEBINK AFFIDAVIT, Exhibit 2 at ¶ 25.a-h. Indeed, according to the American Medical Association, Aid Access, no doubt via Mayday's website, has shipped hundreds of abortion pills into the Black Hills counties of Pennington, Lawrence, Meade, Fall River, Custer, Butte and Oglala Lakota and the east river counties of Minnehaha and Lincoln alone. *Telemedicine Under Shield Laws in the US*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION 2025;334;(15):1388-1390.doi:10.1001/jama.2026.11420, Exhibit 4. Mayday does not even pretend that it is not soliciting and facilitating criminal conduct, it is simply counting on the fact that it is peddling abortion drugs and not methamphetamine will procure it judicial license to skirt the laws of this state.

But Mayday's advertising, even according to its own authorities, is speech integral to illegal drug transactions and abortions. Accordingly, Mayday cannot possibly succeed on the

28

merits of its First Amendment or CDA claims.  As applied to the facts here, Mayday's request for

a preliminary injunction must be denied.

Dated this 16th day of June 2026.

**MARTY J. JACKLEY**
**ATTORNEY GENERAL**

*Paul S. Swedlund*

Paul S. Swedlund
SOLICITOR GENERAL
Amanda J. Miiller
DEPUTY ATTORNEY GENERAL
Grant M. Flynn
Jacob R. Dempsey
ASSISTANT ATTORNEYS GENERAL
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Telephone: 605-773-3215
paul.swedlund@state.sd.us