UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| Mayday Health and Nancy Turbak Berry, | ) ) ) | |
| Plaintiffs, | ) ) | No. 4:26-cv-04096-CCT |
| v. | ) ) | |
| Governor Larry Rhoden and Attorney General Marty Jackley, sued in their official capacities, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**Reply Memorandum in Support of**
**<u>Motion for Preliminary Injunction</u>**

# Table of Contents

I.      Introduction                                                                            3

II.     Judge Failla's rulings on the issues now before this Court merit         5
        careful consideration

III.    The truth or falsity of Mayday's speech, and whether it is misleading,   7
        incomplete, or dangerous, are irrelevant; the First Amendment bars
        the State from compelling Mayday to speak as the State wishes it
        would speak

IV.     Mayday's speech is not criminal                                          9

V.      Mayday's speech is not "commercial"                                      17

VI.     HB 1274 "advertise" prohibition discriminates based on viewpoint        19
        and is unconstitutionally overbroad

VII.    Section 230 immunizes Mayday from liability for information on           22
        websites to which it links

VIII.   Mayday and Turbak are entitled to a preliminary injunction              23

IX.     Conclusion                                                              25

## I.      Introduction

This case presents only three issues: whether House Bill 1274 is unconstitutional and violates the Communications Decency Act as applied to Mayday; whether it is unconstitutional as applied to Nancy Turbak Berry; and whether its "advertise" prohibition is unconstitutional on its face.  HB 1274 legitimately prohibits anyone from "knowingly dispens[ing], distribut[ing], or sell[ing]" an abortion pill in South Dakota; plaintiffs do not challenge those provisions. Doc. 4 at 4.  No word in a statute is read as surplusage.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up).  So HB 1274's prohibition on "advertis[ing]" forbids something in addition to "dispens[ing], distribut[ing], or sell[ing]" an abortion pill.

Mayday states forthrightly that it "provides *information* free of charge so that women can, *if they choose*, terminate pregnancies safely even though they live in places like South Dakota that limit or outlaw abortion."  Doc. 1 ¶ 6 (emphasis added).  Turbak states forthrightly that she wants to provide the same information that Mayday provides.  Doc. 6 at 2 (Turbak wants to wear her Mayday sweatshirt

that reads "*They don't want you to know this:* You can still get ABORTION PILLS *in all 50 states* Learn More at Mayday.Health.")

The State admits that the First Amendment bars it from sanctioning Turbak's advertising of abortion pills.  It admits that Turbak's sweatshirt, which tells the reader she can still get abortion pills in South Dakota and elsewhere, and invites the reader to "Learn More at Mayday Health," is protected speech.  It admits that the statement "I encourage you to obtain [abortion pills]" is protected speech, just as "teaching how to make explosives is First Amendment protected," "passive advocacy for bomb making," "recommend[ing] marijuana" or "medical advice to try marijuana is not illegal," and "exhort[ing] others to train for *jihad*" are protected speech.  Doc. 15 at 2-5.

The State does not dispute the First Amendment principles that govern this case: that it "may not regulate speech based on its substantive content or the message it conveys," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); that speech on matters of public interest "occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special protection," *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); and that "government has no power to restrict

expression because of its message, its ideas, its subject matter, or its content," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011).  Doc. 4 at 10.

The State's arguments for limiting Mayday's First Amendment rights are that Mayday's speech is false, that it is criminal, that it is commercial, and that Section 230 may not apply.  Plaintiffs show below that the State is wrong.

## II.    Judge Failla's rulings on the issues now before this Court merit careful consideration

Judge Katherine Polk Failla of the United States District Court for the Southern District of New York heard this dispute and ruled that the First Amendment protects Mayday's speech.  She ruled:

- "I do believe that the proper way to view Mayday's website and the materials on it is noncommercial speech subject to protection under the First Amendment."  Doc. 5-13 at 14.

- "[A]bsent Younger abstention, this Court would be granting plaintiff's motion for injunctive relief."  Doc. 5-13 at 15.

- "My read—what the materials I have before me suggest that Mayday's website contains, under what I will call the NIFLA [*National Institute of Family and Life Advocates v. James*, 160 F.4th

5

360 (2d Cir. 2025)] case, noncommercial speech. It is speech that is based on moral beliefs with no economic motivation. The plaintiff does not charge the patrons of the website or the service providers for referrals and the fact that the website solicits donations does not transform its contents into commercial speech[.]" Doc. 5-13 at 15-16.

- "I also do not believe that the website solicits or abets acts that are illegal under South Dakota law. And here I'll just cite to the parties *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, and the section that I was focusing on is found at pages 253 to 254." Doc. 5-13 at 16.

- "[I]f I had jurisdiction, which I don't believe I do, I think the South Dakota statute would be subject to strict scrutiny analysis and we would see whether it was narrowly tailored to serve a compelling state interest under NIFLA, [and] the answer would probably be no." Doc. 5-13 at 16-17.

The State says that Judge Failla's ruling are *dicta*. And they are. They are still entitled to careful consideration. "Dicta can be a source of advice to successors,

6

sometimes thoughtful advice that ought to be heeded." *Bryan A. Garner et al.*, The Law of Judicial Precedent (Thomson Reuters 2016) at 65. Dicta "may be followed if sufficiently persuasive[.]" *Central Green Co.*, 531 U.S. 425, 431 (2001), quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 726 (1935).

**III.   The truth or falsity of Mayday's speech, and whether it is misleading, incomplete, or dangerous, are irrelevant; the First Amendment bars the State from compelling Mayday to speak as the State wishes it would speak**

Judge Failla did not address whether Mayday's speech is true or false, and for good reason: it is profoundly irrelevant. Nonetheless, most of the State's brief is devoted to attempting to demonstrate that Mayday's speech is false, misleading, dangerous, or incomplete. Doc. 16 at 4 (State says Mayday's website is "misleading," "fails to inform [a] woman" accurately about "shield laws," provides "false and misleading information" and "illegal advice"); at 5 (State says Mayday fails to mention risks of abortion pills); at 6 (Mayday "does not inform women" of certain alleged facts and laws, does not "give a straight answer," instead providing "evasions or bald-faced lies"); at 7 (Mayday links to other websites that fail to provide accurate information); and at 21-24 (State asserts that pretty much everything Mayday says is false, misleading, incomplete, and dangerous).

7

There is no "general exception to the First Amendment for false statements." *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality) (government may not punish a person for falsely claiming that he received the Congressional Medal of Honor). This follows from the principle that the government may not "restrict expression because of its message, ideas, subject matter, or content," which makes content-based restrictions "presumed invalid." *Id.* at 716-17.

Likewise, the First Amendment prohibits the government from compelling speech. "The doctrine of compelled speech is concerned about 'the government putting particular messages in the mouths of private speakers.'" *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 494 (8th Cir. 2025) (en banc), quoting *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015). "[T]he First Amendment does not leave it open to public authorities to compel a person to utter a message with which he does not agree." *Id.*, quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005).

These principles follow from Justice Robert Jackson's famous writing: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If

8

there are any circumstances which permit an exception, they do not now occur to us." *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943) (government may not compel children to salute the flag and recite the Pledge of Allegiance).

The State may not compel Mayday to publish speech the State contends would make Mayday's speech "true" or "not misleading," and may not punish Mayday for failing to publish such speech. Any other rule would make the State the arbiter of what Mayday is allowed to say; and it would make every state the arbiter of what others are allowed to say. Mayday stands by its speech as true. But whether it is true, false, or misleading is irrelevant.

## IV.    Mayday's speech is not criminal

The State argues that Mayday's speech is not protected by the First Amendment because it "solicits or facilitates an illegal abortion." Doc. 16 at 1. But the State's admission that the First Amendment does not allow it to criminalize Turbak wearing a Mayday sweatshirt that conveys Mayday's message—namely that abortion pills are available in all states, and that more information is available at Mayday Health—torpedoes the State's argument. Mayday's speech does not solicit or facilitate an illegal abortion any more than Turbak's speech does.

Tellingly, the State does not even mention, or attempt to distinguish the case that Judge Failla found most on point, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), which Mayday relied on in its opening brief. Doc. 4 at 14-15. Under *Ashcroft*, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." 535 U.S. at 253. *Ashcroft* held an act criminalizing "virtual child pornography" unconstitutional because of the "vital distinctions between words and deed, between ideas and conduct." *Id.* Only speech that becomes "attempt, incitement, solicitation, or conspiracy" can be punished. *Id.* The State ignores *Ashcroft* and these principles.

The State's core analogy is that its right to criminalize a substance—methamphetamine being its favorite example—gives it the right to criminalize speech about that subject. But again this is contrary to *Ashcroft*, and is undermined by the State's admission that "teaching how to make explosives is First Amendment protected," as are "passive advocacy for bomb making," "recommend[ing] marijuana," "medical advice to try marijuana," and "exhort[ing] others to train for *jihad*." Doc. 15 at 2-4. Making explosives, making bombs, using marijuana, and engaging in *jihad* are criminal. But as the State admits, "teaching," "advocacy," "recommending," and "exhorting" others about them are *not* criminal.

10

The State relies on *United States v. Williams*, 553 U.S. 285, 297 (2008), which says that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection."  It relies also on *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973), holding that a newspaper may be prohibited from carrying want ads that discriminate by gender, or for other illegal transactions like selling narcotics or prostitution.  And it relies on *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949), involving illegal attempts to restrain trade by compelling a company to refrain from selling ice to nonunion peddlers.

But Mayday does not offer to engage in any illegal transactions.  It does not sell or ship, or offer to sell or ship, abortion pills to anyone.  Mayday provides information, including links to other entities that may provide abortion pills.  Mayday's only interest is in providing information.  Mayday obtains no benefit of any kind if a woman goes from its website to another website and decides to purchase abortion pills.

The State says it can regulate Mayday's speech under *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969), which allows a State to prohibit "advocacy that is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Brandenburg* protects Mayday.  Mayday only makes information available;

it does not advocate that anyone take an abortion pill; it does not "incit[e]" anyone to do anything, and nothing it does can produce "imminent lawless action." It only allows women to make their own choices. And contrary to the State's telling, Mayday is not a "middleman" because it only provides information, it does not benefit from providing it. Mayday never even knows whether any person who has visited its website later purchases abortion pills or not.

*Brandenburg* recognizes that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." 395 U.S. at 448, quoting *Noto v. United States*, 367 U.S. 290, 297-98 (1961) (ellipsis in original). Mayday does not teach anyone that they should do anything, nor does it prepare anyone to do anything.

It is *not* illegal for a woman in South Dakota to take an abortion pill. S.D.C.L. § 22-17-5.2 ("A female who undergoes an unlawful abortion, as set forth in § 22-17-5.1, may not be held criminally liable for the abortion.") So a woman who receives and takes an abortion pill in South Dakota commits no crime.

The State's multiple bullet points alleging that Mayday has "crossed the line" from providing information to engaging in a criminal transaction all fail. Contrary

to the State's allegations, Mayday does not offer to provide abortion pills; it does not induce their transfer; it has no intent to initiate a transfer of anything, nor to bring about a particular act; it does not recommend how or when specific illegal acts be performed; and it does not provide the means for obtaining illegal drugs.  Mayday is not a "middleman" for anything except in the sense that anyone who provides information about anything to anyone is a middleman.  The State has conceded that merely providing information is protected speech, and the State has conceded that even "encourage[ment]," "teaching," "advocacy," "recommend[ing]," "advice," and "exhort[ing]"—*none of which Mayday does*—is protected speech.  Doc. 15 at 2-4.

The State mischaracterizes Mayday's authorities. *Bigelow v. Virginia*, 421 U.S. 809, 821-22 (1975), recognizes "[t]he legitimacy of appellant's First Amendment claim," because the advertisement "did more than simply propose a commercial transaction.  It contained factual material of clear 'public interest.'" So too here. *Bigelow* relies on First Amendment freedom of speech, not on abortion being constitutionally protected.  "Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State

and its development, and to readers seeking reform in Virginia." *Id.* at 822. Virginia had no legitimate "interest in shielding its citizens" from this information about activities outside its borders that its police powers do not reach. *Id.* at 827-28. So too here.

This is the heart of First Amendment freedom: "The policy of the First Amendment favors dissemination of information and opinion, and the guarantees of freedom of speech and press were not designed to prevent the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential." *Id* at 829 (cleaned up).

*Nat'l Inst. of Fam. & Life Advocates v. James*, 160 F.4th 360 (2d Cir. 2025), another case Mayday cited that the State attempts to distinguish, granted First Amendment protection against New York's attempt to regulate speech about reversing the effects of an abortion pill, because the speech was noncommercial, religiously and morally motivated, the plaintiffs received no benefit for engaging in it, and they did not provide abortion pill reversal, but instead would "refer individuals to third-party providers who" provide it. 160 F.4th at 378. The State attempts to distinguish *James* on the ground that abortion pill reversal is not "illegal" in New York, but the entire

14

premise of New York's case was that the speech at issue about abortion pill reversal was unlawful because it was false and misleading, thereby violating New York's business laws and constituting fraud.

The State also takes issue with *Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024), but Idaho *conceded* that "providing information to minors" about abortions was not covered by its law. 122 F.4th at 809. This concession alone would doom South Dakota's case. And *Matsumoto* goes much farther. After conceding it could not bar providing information about abortion to minors, Idaho still sought to enforce its provision against "recruiting" a pregnant minor in Idaho "with the intent to conceal the abortion from the minor's parents or guardian." 122 F.4th at 794. The court held the "recruiting" provision unconstitutionally overbroad. The court stated: "Encouragement, counseling, and emotional support are plainly protected speech under Supreme Court precedent, including when offered in the difficult context of deciding whether to have an abortion." 122 F.4th at 811. Likewise, "[i]nformation and instructions regarding the availability and means of procuring an abortion procedure or drug (likely including specifics, such as who the provider is, when and where the procedure would take place, or what a drug would cost) are

15

thus squarely protected." 122 F.4th at 812.  These principles protect speech and conduct far beyond anything that Mayday engages in.

According to the State, *Matsumoto* supports its "integral to criminal conduct" theory.  But the opposite is true.  *Matsumoto* recognizes that "[t]o qualify as speech 'integral to unlawful conduct,' the speech must be done in furtherance of the commission of an underlying criminal offense." 122 F.4th at 813.  Here Mayday has committed no underlying criminal offense.  *Matsumoto* recognizes that "[l]abeling protected speech as criminal speech cannot, by itself, make that speech integral to criminal conduct."  122 F.4th at 814.  In *Matsumoto*, recruiting a minor to have an illegal abortion in Idaho would be a crime, but providing information to that minor about abortion was protected First Amendment speech.  So too here, recruiting a person to have an illegal abortion in South Dakota would be a crime, but providing information to her about abortion is speech protected by the First Amendment.

The State's analysis of *Welty v. Dunaway*, 791 F. Supp. 3d 818 (M.D. Tenn. 2025), is just as faulty as its analysis of *Matsumoto*.  Plaintiffs were abortion rights advocates who sought to counsel pregnant minors about their abortion options.  They sued to enjoin the state from prosecuting them under its law that bars intentionally recruiting a minor to have an abortion that would be illegal in

16

Tennessee.  The court enjoined the recruitment provision as overbroad because  it covered speech that was perfectly lawful.  Thus it was a "content-based restriction" that was "an egregious form of content discrimination," because it punished speech based on the speaker's "opinion or perspective," in violation of the First Amendment.  791 F. Supp. 3d at 838, quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  So too here, HB 1274 covers speech based on its content.  Mayday does not even "recruit" anyone to do anything.  It provides information for women who may choose to use it.  HB 1274, like the Tennessee statute, discriminates based on viewpoint and is facially overbroad.

In summary, the State's entire argument rests on mischaracterizing what Mayday does and what the law allows the State to prohibit.  Mayday's speech is not criminal.  It is protected by the First Amendment.  HB 1274 cannot constitutionally be applied to Mayday and is unconstitutional on its face.

## V.     Mayday's speech is not "commercial"

The State touches on the theory that Mayday's speech is "commercial" and therefore, it claims, entitled to less than full First Amendment protection.   How much less protection it is entitled to, in the State's theory, is unclear.  Actually, Mayday is a noncommercial entity and is entitled to the full protection of the First

17

Amendment. Judge Failla correctly ruled: "I do believe that the proper way to view Mayday's website and the materials on it is noncommercial speech subject to protection under the First Amendment." Doc. 5-13 at 14.

Mayday is a nonprofit. It exists to convey information that it believes women should have. It acts from a profoundly moral basis. Mayday is not a commercial enterprise. Mayday does not sell, handle, or distribute abortion pills or any other healthcare-related merchandise or service. No statements on Mayday's website or advertisements propose or advertise any commercial transaction.

Money is not a talisman that magically wards off the First Amendment. The fact that Mayday, like every entity in the modern world, must have money to convey its message, does not change its First Amendment protection. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 801 (1988). Money spent for political advocacy is fully protected speech, because it enables speech, and is necessary for speech to be effective: "All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech[.]" *Citizens United v. FEC*, 558 U.S. 310, 351 (2010).

18

"Commercial speech" is "speech that does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014), quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). None of Mayday's speech proposes a commercial transaction, let alone "merely" proposes it. Even "the expression of opinion about a commercial product such as a loudspeaker is protected by the First Amendment," as is expressing an opinion about a marketable security in a paid newsletter, even though they are both plainly commercial events. *Lowe v. SEC*, 472 U.S. 181, 210, 210 n.58 (1985).

"The First Amendment extends to all persons engaged in expressive conduct, including those who seek profit (such as speechwriters, artists, and website designers)." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023). Mayday does not seek profit. But it does engage in expression: speech about a matter of deeply held belief. So the First Amendment protects its speech. And the fact that it accepts donations and sells merchandise that bears its message does nothing to alter this.

## VI.   HB 1274 "advertise" prohibition discriminates based on viewpoint and is unconstitutionally overbroad

HB 1274 prohibits speech based on the viewpoint of the speaker. Doc. 4 at 10-14. The State does not dispute this. The State also does not dispute that HB 1274 is

unconstitutionally overbroad if it bans or chills a substantial amount of protected speech. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002).

Mayday and Turbak brought this action because the State's repeated threats to prosecute Mayday criminally under existing law; plus the legislative history of HB 1274; plus Attorney Jackley's testimony to the Legislature; plus HB 1274's sharpening of the statute to allow undercover agents to pursue Mayday; all made Mayday and Turbak keenly aware that starting July 1 they face criminal and civil prosecution for conveying their core message that abortion pills are available in all 50 states, and that anyone can learn more at Mayday's website. Doc. 1 ¶¶ 10, 13-16, 18-24, and 31; Doc. 4 at 5-7 and 18-21.

According to the State, none of Turbak's speech is criminal, but all of Mayday's speech is criminal. Doc. 15 (Turbak); Doc. 16 at 18 (Mayday). The State's theory rests on its argument that "advertise" should *not* be given its plain meaning, but instead must be read hypertechnically. But this is contrary to South Dakota's plain meaning rule, and contrary to South Dakota law, in which "advertise" means "to announce, apprise, . . . give notice of, inform, make known[.]" *Foley v. State ex rel. South Dakota Real Estate Comm'n*, 1999 S.D. 101, ¶ 17, 598 N.W.2d 217, 221, citing Black's Law Dictionary (6th ed. 1990) (ellipsis and bracket by court).

20

The State admits that "'advertise' in the general sense means 'to make the public aware of (something or someone) especially by means of a published or broadcast notice[.]'" Doc. 15 at 1.  Under this definition, which is the plain meaning of the statute, everything Turbak and Mayday say is felonious, including matters obviously protected by the First Amendment, such as Mayday's sweatshirt that Turbak wants to wear.  The State argues that the plain meaning of "advertise" does not apply to HB 1274.  Doc. 15 at 1-5.

But the State's Response to Motion for Preliminary Injunction (Doc. 16) stands its prior position on its head by asserting that "advertise" in HB 1274 may be understood *only* in its "narrow, transactional sense."  Doc. 16 at 17.  The State's Response does not even mention the plain meaning of the word.  The State was right in Doc. 15 and is wrong in Doc. 16.

The State's entire argument about overbreadth rests on the thin reed of its "narrow, transactional sense" theory.  The State says *"When 'advertise' is so understood*, S.D.C.L. § 22-17-5.3's . . . sweep . . . is plainly legitimate."  Doc. 16 at 17 (emphasis added).  But South Dakota's plain meaning rule and *Foley v. State ex rel. South Dakota Real Estate Comm'n* control.  *See* Turbak's Opposition to Motion to Dismiss, filed herewith.

The State writes: "Mayday brags that it 'exists to provide . . . mail-order abortion pills . . . in all 50 states, regardless of harmful state restrictions." Doc. 16 at 17 (ellipses by State). This is an egregious misstatement. The State provides no citation for it. Mayday does not provide abortion pills to anyone. Nor has it ever done so.

HB 1274 is overbroad because under the plain meaning of "advertise," Turbak's and Mayday's speech is criminal. Their conduct is protected by the First Amendment, as discussed in sections III, IV, and V above. HB 1274 discriminates based on viewpoint, and is unconstitutionally overbroad because it bans or chills a substantial amount of protected speech.

## VII.   Section 230 immunizes Mayday from liability for information on websites to which it links

The State does not dispute any of the law that Mayday cited in support of its Section 230 argument. The State rests its entire claim that the Communications Decency Act does not apply on two arguments. First, it says that Mayday's *own* website content—not other entities' content it links to—violates S.D.C.L. § 22-3-3 ("Any person who, with the intent to promote or facilitate the commission of a crime, aids, abets, or advises another person in planning or committing the crime,

is legally accountable, as a principal to the crime"), S.D.C.L. § 22-4A-1 ("Any person who, with the intent to promote or facilitate the commission of a crime, commands, hires, requests, or solicits another person to engage in specific conduct which would constitute the commission of such offense of an attempt to commit such offense, is guilty of criminal solicitation"), and S.D.C.L. § 22-17-5.3 (HB 1274). Mayday disagrees. The facts will be addressed through testimony and exhibits at the hearing. Second, Mayday asserts that "there are facts which need to be developed" before the Section 230 issue can be addressed. The time to develop those facts is at the preliminary injunction hearing.

## VIII. Mayday and Turbak are entitled to a preliminary injunction

The State concedes that loss of First Amendment freedoms, for even minimal periods of time, is irreparable injury. Doc. 16 at 18. So if Mayday's speech is protected, it will suffer irreparable injury starting July 1. The State asserts that Mayday's speech is economically motivated, not morally motivated. This is not so. Even if it were, the First Amendment still applies.

South Dakota's "balance of equities/public interest" argument rests on its claim that Mayday's speech is illegal and that accordingly it has no First Amendment interest. But if Mayday is right that its speech is protected by the First

Amendment, these factors favor a preliminary injunction. *Dakotans for Health v. Johnson*, 4:25-CV-04050-CCT, Doc. 68 at 15 ("there is no interest in enforcing unconstitutional restrictions,") citing *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022).

South Dakota's only other argument is that the State's anti-abortion interests, and the alleged health threats from abortion pills, weigh against an injunction. But as noted in Section III above, these arguments are irrelevant. The State cites no authority that it can suppress First Amendment speech in order to further its view of public health. If it could do so, it could prohibit all speech about abortion or any other subject—vaccines, COVID, etc.—on the ground that the speech is a public health threat. But "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided,' [or even] likely to cause 'anguish' or 'incalculable grief.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (citations omitted).

If the Court rules that HB 1274's "advertise" prohibition is unconstitutional on its face, the next issue is whether it can be severed from the rest of HB 1274. An unconstitutional provision can be severed from a statute when the remaining provisions can stand on their own. *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874,

893-94 (D.S.D. 2019) (court enjoins unconstitutional provisions of statute and leaves rest in effect). That is true here. So if the Court holds HB 1274's "advertise" prohibition unconstitutional, it should sever it from the rest of HB 1274, leaving the remainder of the statute in place.

## IX.    Conclusion

According to the State, the Court "need look no further tha[n] the Giebink affidavit to find proof of Mayday's integral role in importing abortion drugs into South Dakota." Doc. 16 at 28. But Dr. Giebink's affidavit cites no evidence that Mayday sends abortion pills to South Dakota. The closest she comes is to blame Mayday for the conduct of completely separate entities, and a conclusion that lacks any factual basis whatsoever. Doc. 16-2 ¶¶ 18 and 27.

The State derides Mayday speech as "crow[ing]," "brag[ging]," "strident," "dissident," "mock[ing]," and "in-your-face." Doc. 16 at 2, 17, 19, 20, 26, and 27. What's shocking is that the State asks this Court to give any weight to any of these matters. The First Amendment does not protect only mild, timid, meek, inoffensive speech. "Over seventy-five years ago, the Supreme Court noted that one of the functions of free speech is to invite discussion and even dispute. 'It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction

25

with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.'" *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 490 (8th Cir. 2025) (en banc), quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

The First Amendment provides Mayday with the right to speak even though some people don't want to hear its message. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011), quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988).

Dated: June 21, 2026          Respectfully submitted,

/s/ James D. Leach
James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702

Tel: (605) 341-4400
jim@southdakotajustice.com
Attorney for Plaintiffs

Certificate of Service

I certify that on June 21, 2026, I filed this document by CM/ECF, thereby causing automatic electronic service to be made on all other parties.

/s/ James D. Leach
James D. Leach

27