UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| Mayday Health and Nancy Turbak Berry, | ) ) ) | |
| Plaintiffs, | ) | No. 4:26-cv-04096-CCT |
| | ) | |
| v. | ) | |
| | ) | |
| Governor Larry Rhoden and Attorney General Marty Jackley, sued in their official capacities, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**Plaintiffs' Post-Hearing Brief re: Section 230**

# Table of Contents

I.    Background to this brief                                                                3

    A.    Previous briefing on Section 230                                              3

    B.    Section 230's plain language immunizes Mayday from liability        3
        for content provided by other information content providers

    C.    The Eighth Circuit applies Section 230 as written                        5

II.    Contrary to the State's arguments, Mayday is not an "information      6
content provider" for the websites it links to because it is not
"responsible, in whole or in part, for the creation or development of"
their allegedly unlawful content; even ratification or adoption would
not constitute "creation" or "development"; and linking to them is
even farther from "creation" or "development"

III.    The State's remaining arguments and authorities confirm Mayday's    13
immunity from liability

IV.    Conclusion                                                                24

I.      **Background to this brief**

A.      **Previous briefing on Section 230**

Mayday Health and Turbak ("Mayday") argued in their opening brief that

House Bill 1274, as the Legislature intends it to be applied to Mayday, and as the

State intends to apply it, violates the Communications Decency Act, 47 U.S.C. § 230.

Doc. 4 at 25. The State responded. Doc. 16 at 24-26. Two hours before Mayday's

reply was due, the State filed a second, untimely, unauthorized response. Doc. 29.

Mayday replied to Doc. 16, then moved to strike Doc. 29. Doc. 31 at 22-23 and Doc.

34. The Court denied the motion to strike, but granted Mayday this opportunity to

respond.

B.      **Section 230's plain language immunizes Mayday from liability for content provided by other information content providers**

Congress enacted Section 230 after finding that "[t]he rapidly developing

array of Internet and other interactive computer services available to individual

Americans represent an extraordinary advance in the availability of educational and

informational resources to our citizens." 47 U.S.C. § 230(a)(1). Congress declared

it "the policy of the United States" to "preserve the vibrant and competitive free

market that presently exists for the Internet and other interactive computer services,

unfettered by Federal or State regulation[.]" 47 U.S.C. § 230(b)(2).

3

The statute provides: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  To apply the plain language of the statute to the facts of this case, the only questions this Court need answer are whether Mayday is a "provider . . . of an interactive computer service," and whether the websites it provides links to are "another information content provider."  If both those facts are true, Mayday cannot be treated as the publisher or speaker of any information from other content providers.

"Interactive computer service" is defined as "any information service . . . that provides or enables computer access by multiple users to a computer server . . . ."  47 U.S.C. § 230(f)(2). Mayday provides a website, www.mayday.health. This makes Mayday a provider of an "interactive computer service."  *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) ("Today, the most common interactive computer services are websites"); *Batzel v. Smith*, 333 F.3d 1018, 1030 n.16 (9th Cir. 2003) ("[A] web-site is an 'interactive computer service.'")

"Information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C.

§ 230(f)(3).  The websites that Mayday links to are "entit[ies] that [are] responsible . . . for the creation or development of information provided through the Internet," so they are "information content providers."

Because Mayday is a provider of an interactive computer service, and the websites it links to are information content providers, Section 230 precludes Mayday from being treated as the publisher or speaker of any information on those websites, so Mayday cannot be held liable based on linking to that information.

### C.     The Eighth Circuit applies Section 230 as written

The CDA "bar[s] plaintiffs from holding ISPs legally responsible for information that third parties created and developed."  *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010).  The CDA "precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."  *Id.* at 792, quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

In *East Coast Test Prep LLC v. Allnurses.com, Inc.*, 971 F.3d 747 (8th Cir. 2020), plaintiffs sought to hold a website liable as the publisher or speaker of information

5

on its website. The case was dismissed because Section 230 "immunizes providers of interactive computer services against liability for content created by third parties." *Id.* at 752, quoting *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). So Mayday cannot be held responsible even if it published content created by others.

Mayday cited these two Eighth Circuit cases in its opening brief. Doc. 4 at 26. The State has not cited a single Eighth Circuit case in response. Nor has it attempted to distinguish Mayday's cases in its response brief (Doc. 16 at 24-26), in its supplemental brief (Doc. 29), or in its Response to Motion to Strike (Doc. 38).

**II.** **Contrary to the State's arguments, Mayday is not an "information content provider" for the websites it links to because it is not "responsible, in whole or in part, for the creation or development of" their allegedly unlawful content; even ratification or adoption would not constitute "creation" or "development"; and linking to them is even farther from "creation" or "development"**

Mayday is not an "[i]nformation content provider" for the websites it links to because it is not "responsible, in whole or in part, for the creation or development of" the information on those websites. Section 230(f)(3). Even if Mayday had ratified or adopted other providers' websites, this would not constitute "creation or development" of that information. *Jones v. Dirty World Entmt's Recordings LLC,*

6

755 F.3d 398, 415 (6th Cir. 2014) (rejecting district court's suggestion that a website becomes a "creator" or "developer" of content when it "ratifies or adopts" the content, because "[a]n adoption or ratification theory . . . is not only inconsistent with the material contribution standard of 'development' but also abuses the concept of responsibility [of § 230(f)(3)]. A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc*.") So Mayday does not become "responsible" for other websites' content by calling the websites "trusted websites and partners," "trusted sources," "trusted organizations," or anything else that arguably "ratifies" or "adopts" them.

Courts widely agree with *Jones* that ratification or adoption does not satisfy Section 230's "creation or development" test. *Parisi v. Sinclair,* 774 F. Supp. 2d 310, 316 (D.D.C. 2011) (Section 230 immunity is not lost if website "adopted" third-party statements). *Advanfort Co. v. Cartner*, 2015 U.S. Dist. Lexis 199411 *12-13 , 2015 WL 12516240 (E.D. Va.) (follows *Jones* and *Parisi*; website does not become an information content provider by including a byline on an article or tweeting it; "Although these actions may indicate to the public that [defendant] adopted the views in the Article, that is inconsequential because these actions do not show that [defendant] materially contributed to the illegality of the Article.")

7

Other cases agree.  *Doe v. Murphy,* 2025 U.S. Dist. Lexis 171401 *64-65 (D.S.C.) (following *Jones* and holding a website is entitled to Section 230 immunity even though "it selected and edited content for display by changing the tags or categories to more popular tags, thereby increasing its viewership and implicitly encouraging the posting of similar content.")  *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 368 (D. Mass. 2017) (following *Jones* and *Roommates.com*, rejecting "[a]n adoption or ratification theory.")  *Doe v. Fenix Int'l, Ltd.,* 2025 U.S. Dist. Lexis 16340 *18 (S.D. Fla.) (quoting *Jones*, rejecting "an adoption or ratification theory" as "inconsistent with the material contribution standard of development," and because it "abuses the concept of responsibility.").

The "material contribution" standard "does not refer to 'merely . . . augmenting the content generally, but to materially contributing *to its alleged unlawfulness.*'"  *Gonzalez v. Google*, 2 F.4th 871, 892 (9th Cir. 2021), quoting *Roommates.com*, 521 F.3d at 1167-68.  In other words, "material contribution" means "being responsible for what makes the displayed content allegedly unlawful." *Id.*, quoting *Jones*, *supra*, 755 F.3d at 410.  Mayday did not augment the content of the other websites, and it did not contribute, materially or otherwise, to their alleged unlawfulness, so Mayday is not "responsible" for their alleged unlawfulness.

8

Section 230(f)(3).  *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009) ("[A] service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content.")

Likewise, "taking actions necessary to display content created or developed by another does not constitute development of information for the purpose of § 230(f)(3)." *General Steel Domestic Sales, LLC v. Chumley*, 2015 U.S. Dist. Lexis 108789 * 17 (D. Colo.).  Even "minor editing of content developed by third parties does not constitute development, as long as the changes do not contribute to the false, misleading, or otherwise unlawful nature of the underlying information." *Id.* at *17-18.  A website "is not required to serve as an intermediary or a mere conduit in order to enjoy immunity." *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, 2004 U.S. Dist. Lexis 6678 *24 (N.D. Tex.).

The State admits that a website maintains its Section 230 immunity when it displays another website's allegedly illegal content.   "Under the material contribution exception, a website owner may be liable 'if it contributes materially to the alleged illegality of the conduct.' [citing *Jones* and *Roommates.com*] '*A material contribution to the alleged illegality of the content does not mean merely taking action that*

9

*is necessary to the display of the allegedly illegal content.* Rather, it means being responsible for what makes the displayed content allegedly unlawful.'" State's Response to Plaintiffs' Motion in Limine, Doc. 40 at 3 (emphasis added).

Just as ratification or adoption of another party's website does not "create" or "develop" it, merely linking to it—what Mayday does—does not "create" or "develop" it. *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 700 (S.D.N.Y. 2009) ("an interactive computer service is not liable where it posts or links to a third-party's content.") *Universal Commun. Sys. v. Lycos, Inc.*, 478 F.3d 413, 416, 420 (1st Cir. 2007) (defendant's links to another website, and even receiving advertising revenue based on the volume of usage of the sites, does not make it responsible for information on the other website).

In *Directory Assistants v. SuperMedia, LLC*, 884 F. Supp. 2d 446 (E.D. Va. 2012), plaintiffs sued a website and argued that whether the website was a "user" and entitled to § 230(c)(1) immunity required that "the Court must engage in a fact-dependent inquiry to determine if Defendants obtained the information from the interactive computer services themselves, or if the content was sent to them by someone else." 884 F. Supp. 2d at 451. The court rejected this request, finding it irrelevant whether defendants obtained the information from the other websites

themselves, or whether the other websites sent the information to defendants.  "The action of compiling information from a website and emailing that information to others clearly constitutes use of that website and its services."  Defendants only linked to the posts from other websites; they did not create or alter them.  So defendants were "immune under the CDA."  884 F. Supp. 2d at 452.

Likewise, it is irrelevant whether Mayday obtained the information from the other websites and posted links to them.  Mayday is a "user" of the other websites and is entitled to Section 230 immunity, just like the *Directory Assistants* defendants.

The State argues that Mayday goes beyond its Section 230 protected right to display allegedly unlawful content in four respects.  First, that Mayday "by placing advertisements in the State of South Dakota, is materially contributing to the illegality because it is acting as a middleman and actively soliciting where an abortion pill provider could not."  Doc. 40 at 4.  But none of Mayday's ads solicit the sale of anything, and Mayday does not sell anything that could produce an abortion.  Second, that Mayday "materially contributes to the illegality by placing direct links on its website to third-party affiliates where consumers can order abortion pills that are illegal in South Dakota."  But Mayday has no "affiliates," and as just discussed,

11

linking to another website does not "create" or "develop" the alleged illegal content, and does not allow Mayday to be treated as its publisher or speaker per § 230(c)(1).

Third, the State argues that Mayday "promotes the content of its third-party affiliates by guaranteeing that abortion pills are 'safe,' that Mayday Health only relies upon '[t]op clinicians, lawyers, and health experts[,]' by touting that its third-party affiliates 'have the best content for a certain aspect of abortion care[,]' and by calling its third-party affiliates 'trusted websites and partners.'" Doc. 40 at 4. But no matter how many times the State repeats the word "affiliates," Mayday has none; Mayday has the First Amendment right to state its opinions (not "guarantees") about abortion pill safety without interference by the State, as briefed at Doc. 31 at 7-9; and as discussed above, Mayday does not become "responsible" for the "creation" or "development" of allegedly illegal content of a third-party website by calling it "trusted."

Fourth and finally, the State argues that Mayday "materially contributes to the illegality of the third-party affiliates by providing step-by-step instructions on how to use mail-forwarding to obtain illegal abortion pills through its affiliate links." Doc. 40 at 4. Regardless of whether this would be material to anything if it were

12

true, it is not true.  Leo Raisner testified on rebuttal that the instructions were removed from Mayday's website some time ago.

In summary, Mayday may not be treated as the publisher or speaker of any information provided by other websites, because Mayday did not create or develop the information on those websites, nor did Mayday materially contribute to what makes the displayed content allegedly unlawful.  Neither ratification nor adoption is sufficient; merely linking to them is even less so.  The test is whether Mayday materially contributed to the creation or development of the other websites' allegedly unlawful content.  There is no evidence Mayday does so, and much testimony from Leo Raisner that Mayday does not do so.  So Mayday may not be treated as the publisher of the allegedly unlawful information on the other websites. 47 U.S.C. § 230(c)(1).

### III.    The State's remaining arguments and authorities confirm Mayday's immunity from liability

The State makes five remaining arguments.  *First*, the State argues that Section 230 "only immunizes a Service Provider for the *third-party* content it hosts; it does not immunize a Service Provider for its *own* content."  Doc. 16 at 24.  But Mayday does not offer abortion pills or anything similar for sale.  Abortion pills can come

only from other internet service providers.  The State relies on *Calise v. Meta Platforms*, 103 F.4th 732, 744 (9th Cir. 2024), but *Calise* strongly supports Mayday. *Calise* says that the "creation or development in whole or in part" words of § 230(f)(3) mean "a website helps to develop unlawful content . . . if it contributes materially to the alleged illegality of the conduct," citing *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (en banc).  Mayday does not contribute at all, let alone materially, to the alleged illegality of the other websites' content.

The State relies on *Roommates.com*.  Doc. 29 at 3.  But in that case, the defendant required subscribers to answer allegedly discriminatory housing preferences (information as to sex, sexual orientation, and whether they have children), and published that information on its "profile page," thereby "creating" or "developing" the information. 521 F.3d at 1164-66. Mayday does not do anything similar to "create" or "develop" allegedly unlawful information.  *Roommates.com* rejects a broad interpretation of "develop": "[U]nder a pedantic interpretation of the term 'develop,' any action by the website—including the mere act of making a text box available to write in—could be seen as 'develop[ing]' content.  However, we

have already rejected such a broad reading of the term 'develop' because it would defeat the purpose of section 230." *Id.* at 1174 n.38.

The State's argument seems to be that *any* third-party content that a website hosts becomes the website's own content. But this argument ignores § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"). And it ignores § 230(f)(3) ("The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the *creation or development* of information provided through the Internet or any other interactive computer service") (emphasis added). And it also ignores the State's own concession that "merely taking action that is necessary to the display of the allegedly illegal conduct" is protected by Section 230. Doc. 40 at 3.

*Second*, the State argues that "Mayday's website contains a great deal of content in aid of the service it provides to its third-party affiliates, which makes it both a Content and Service Provider." Doc. 16 at 24. But Mayday has no "third-party affiliates"; nor does it provide any "service" to any such "affiliates"; and it has no "content in aid of" such (nonexistent) "service." If the State is referring to Chatbot Charley, that is now irrelevant history. No current user could be affected

15

by Chatbot Charley, because it is no longer on Mayday's website, it belonged to another organization, and according to Leo Raisner's undisputed testimony, it will not return to Mayday.

*Third*, the State argues that Section 230 "immunizes Service Providers from liability based on content *posted* by third parties," citing *Anderson v. TikTok*, 116 F.4th 180, 183 (3d Cir. 2024). But the part of *Anderson v. TikTok* that the State quotes recounts the original motivation behind what became Section 230, *not* the statute that was enacted after winding its way through Congress. *Anderson v. TikTok* says that "Congress *enacted* § 230 of the CDA to immunize interactive computer services ('ICSs') from liability based on content posted by third parties in certain circumstances." *TikTok*, 116 F.4th at 183. And that's true: Congress enacted the CDA "in response to a state-court decision which held that the provider of an online messaging board could be liable for defamatory statements posted by third-party users of the board." *TikTok*, 116 F.4th at 183 n. 7, quoting *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

The state-court decision that *TikTok* refers to was *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 N.Y. Misc. Lexis 229 (N. Y. Sup. Ct. 1995). The CDA "does more than just overrule *Stratton Oakmont*." *F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187,

1195 (10th Cir. 2009).  The text of the statute, not anyone's original motivation, determines its meaning.  "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."  Scalia and Garner, Reading Law: The Interpretation of Legal Texts (Thomson/West 2012) at 56. So "the purpose [of a text] must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires."  *Id.*

As discussed in Section I.B. above, the CDA's definition of "interactive computer service" extends not just to online messaging boards but to all websites. As also discussed in section I.B. above, the CDA defines an "information content provider" as one "responsible, in whole or in part, for the creation or development of information" provided on the internet.  The State's argument is inconsistent with § 230(f)(2)'s definition of "interactive computer service" by limiting it to websites that allow third parties to post content.  The State is wrong in suggesting that the CDA is limited to "an open platform"; no such limitation appears in the Act.

Another case the State relies on, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019), shows how far mistaken the State is.  *Dyroff* confirms that an interactive computer service becomes an information content provider only if "the website it operates *creates or develops* the specific content at issue."  *Id.* at 1097

17

(emphasis added). In *Dyroff*, the interactive computer service (i.e. website) did not "create or develop information (or content)," rather it only "published information created or developed by third parties." *Id.* at 1097-98. So the website was not responsible for third-party content it published.

The *Dyroff* facts illustrate how this principle applies to Mayday. In *Dyroff*, the defendant website posted information ("content") provided by a third-party website about how to obtain heroin. A website user posted, in a "heroin related group," the question "where can i [sic] score heroin in jacksonville, fl." The site sent him an email notification that another user—this one an Orlando-based drug dealer—had posted in the same group. Using this information, the drug seeker and the drug dealer connected off the site. The drug seeker bought fentanyl-laced heroin. *Id.* at 1095. He took it and died. Under Section 230, the website was immune from liability because it neither created nor developed the content in question. *Id.* at 1098-99.

*Dyroff* shows that the State's analogy of abortion pills to illegal drugs (methamphetamine or anything else) does not get the State past Section 230. The State still has a remedy: it can (attempt to) prosecute the abortion pill seller, if the State believes it can surmount the legal obstacles to doing so, i.e. prosecuting an out-

18

of-state entity that is protected by a shield law. The State's choice not to do so thus far suggests that for all its bluster, the State believes that such a prosecution cannot succeed.

Prosecuting the seller was the remedy in *Dyroff*: the seller "was ultimately arrested and prosecuted. He pleaded guilty in March 2017 admitting that he sold heroin laced with fentanyl while active on [defendant website]." *Id.* at 1095. But the website was immune because of Section 230. *Id.* at 1101 ("For the preceding reasons, we AFFIRM the district court's order granting Defendant Ultimate Software's motion to dismiss.")

*Dyroff* helps Mayday in another way. The defendant website allowed users to traffic anonymously in narcotics, and engaged in other practices that made narcotics trafficking easier. It "steered users to additional groups dedicated to the sale and use of narcotics," "sent users alerts to posts within groups that were dedicated to the sale and use of narcotics," "permitted users to remain active accountholders despite evidence that they openly engaged in drug trafficking," and "demonstrated antipathy toward law enforcement efforts to stop illegal activity" on the website. *Id.* at 1095. None of these activities caused it to lose its Section 230 immunity. Mayday allows people seeking abortion pills to use its website

19

anonymously. The State cross-examined Leo Raisner about this, and suggested that there was something nefarious about this. *Dyroff* shows that a website can allow its users to operate anonymously, and a lot more, without affecting its Section 230 immunity.

The State attempts to distinguish *Dyroff* because, the State says, Mayday's website "contains a great deal of non-neutral, Mayday-created content which steers users toward 'trusted' abortion pill merchants of Mayday's choosing whose message Mayday endorses." Doc. 29 at 2. But the facts adduced at the hearing showed no such content, and no such endorsement, at least after Chatbot Charley was removed.

Mayday calls the websites it links to "trusted websites and partners," "trusted sources," or "trusted organizations." As discussed at page 6 to 7 above, even if these statements are construed as "ratification" or "adoption" of the other websites, this does not surmount Section 230 because it does not make Mayday "responsible" for the "creation" or "development" of the allegedly illegal content. In addition, this language is Mayday's First Amendment protected speech, responding to a massive amount of false and misleading information on the internet that attempts to redirect women who want information about abortion to "crisis pregnancy centers" and other websites where they will get information that Mayday considers false and

misleading. "An entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity. [citation omitted]  And that is as true when the content comes from third parties as when it does not." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (cleaned up).  Engaging in such speech does not make Mayday the "creator" or "developer" of the information on the third-party websites, so it does not change the Section 230 analysis.

*Fourth*, the State relies on *Doe v. Internet Brands*, 824 F.3d 846 (9th Cir. 2016), but it contradicts the State's argument. In *Internet Brands*, a website operator learned from an outside source that third parties, using the information on the website, "targeted and lured victims" to drug and rape them, yet failed to do anything to warn potential new victims. *Id.* at 851.  A new victim sued under California law based on the website operator's failure to warn. *Doe v. Internet Brands* holds that Section 230 does not bar such an action. *Id.* at 853 ("this case presents the novel issue of whether the CDA bars Jane Doe's failure to warn claim under California law. We conclude that it does not.")  The case did not implicate Section 230 because Jane Doe's theory of liability was based on the website's failure to warn, not on its failure to remove content from its website. *Id.* at 851.  In this case the opposite is true.  The

21

only way that Mayday can satisfy the State's complaints is by removing information from its website. So this case directly implicates Section 230.

As in *Dyroff*, this leaves neither the State nor any alleged victims without a remedy. The State can pursue criminal remedies against abortion pill providers, if it wishes to do so. The State and any alleged victims can pursue civil remedies against abortion pill providers. But no one can pursue remedies against Mayday for conduct immunized by Section 230.

*Fifth* and finally, the State argues that even without Chatbot Charley, Mayday "is still the virtual equivalent of the streeetcorner pusher who takes a buyer to the house where his friend Aid Access supplies the drug." Doc. 38 at 2. But this argument rests on three fundamental errors. The first is that Section 230 mandates that websites ("interactive computer services") be treated differently than other publishers of information. Section 230 "was enacted based on a congressional concern that treating providers of computer services the same way as traditional publishers would impede the development of the Internet." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009). In Section 230, "[i]nternet publishers are treated differently from corresponding publishers in print, television and radio." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir.

2003).  And much differently than people on the street, to whom Section 230 does not apply.

The second fundamental error in the State's argument is that the alleged criminality of the speech is irrelevant to Section 230 protection.  *Obado v. Magedson*, 2014 U.S. Dist. Lexis 104565 * 22 (D.N.J. 2014) ("regardless of whether the third-party speech itself is unlawful, CDA immunity applies").  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) ("It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech. [citations omitted]  We confirm that view and join the other courts that have held that Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content.")

The third fundamental error in the State's argument is its reliance on *Roommates.com.*  In that case, the website was liable because it asked unlawful questions of prospective renters.  As the court observed, "[i]f such questions are unlawful when posed face-to-face or by telephone, they don't magically become lawful when asked electronically online." 521 F.3d at 1164.  But in the present case, Mayday's website does nothing unlawful.  It speaks.  Its speech is protected by the First Amendment.  It does not break the law, nor does it advise anyone else to break

23

the law. It allows people to make their own decisions. Mayday briefed the lawfulness issue in Doc. 4 at 10-18 and Doc. 31 at 9-17, and will brief it again when it responds to the State's post-hearing brief. Mayday relies on those three briefs rather than add a fourth here.

## IV.  Conclusion

Section 230 establishes rules for the internet different from the rules that apply to newspapers, television, radio, and individuals such as those in the State's hypothetical. Mayday operates within the Section 230 rules. The State has tried every argument to get around Section 230, and has come up empty.

"The circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity." *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019). And "[t]here has been near-universal agreement that section 230 should not be construed grudgingly." *Jane Doe No. 1 v. Backpage.com*, 817 F.3d 12, 18 (1st Cir. 2016). Construing Section 230 narrowly or broadly, grudgingly or ungrudgingly, it protects Mayday from liability for information on the websites to which Mayday provides links, because Mayday neither created nor developed that information, nor did it materially contribute to its alleged illegality. The plain

meaning of Section 230 and a wealth of case law protect Mayday from being held

responsible for other websites' content.

Dated: June 30, 2026 Respectfully submitted,

/s/ James D. Leach
James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400
jim@southdakotajustice.com
Attorney for Plaintiffs

Certificate of Service

I certify that on June 30, 2026, I filed this document by CM/ECF, thereby causing automatic electronic service to be made on all other parties.

/s/ James D. Leach
James D. Leach

25