UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MAYDAY HEALTH and NANCY TURBAK BERRY,<br><br>          Plaintiffs,<br><br>vs.<br><br>GOVERNOR LARRY RHODEN, in his official capacity, and ATTORNEY GENERAL MARTY JACKLEY, in his official capacity,<br><br>          Defendants. | 4:26-CV-04096-CCT<br><br><br>**ORDER ON PENDING MOTIONS** |

Mayday Health and Nancy Turbak Berry fear felony prosecution in South Dakota under newly enacted House Bill 1274, which bars, among other things, any person from advertising anything for purposes of an unlawful abortion. They claim in large part that the new law violates their First Amendment right to speak. Mayday and Turbak brought suit in this Court to declare the law unconstitutional and to permanently enjoin its enforcement against them. They also filed a motion for a preliminary injunction, and the Court held an evidentiary hearing on this request. After careful consideration of the evidence and arguments of counsel, the Court concludes that Mayday and Turbak have standing to bring this lawsuit and have satisfied their burden, at this preliminary stage, of proving the four factors governing the issuance of injunctive relief.

1

## BACKGROUND

"Mayday Health is a 501(c)(3) reproductive health education nonprofit." Docket 1 ¶ 1. "Mayday was founded in May 2022, in the wake of *Dobbs v. Jackson Women's Health Organization*, to respond to widespread confusion, fear, and misinformation." *Id.* ¶ 5. According to Leo Raisner, one of the co-founders of Mayday, abundant misinformation exists on the subjects of morning after pills, birth control, abortion, and gender affirming care, and Mayday was established to provide accurate information.[1] He testified that Mayday consults with medical professionals in regard to the information it provides on these subjects. He further testified that Mayday does not give medical or legal advice directly but, rather, includes links on its website to hotlines for medical and legal advice. *See id.* ¶ 6.

Raisner testified that Mayday is funded by grants, merchandise sales, and small-dollar donations. *See id.* ¶ 8. According to Raisner, in the past year, Mayday has received $2.3 million in grants, approximately $28,000 in charitable contributions on its website, and approximately $3,000 from merchandise sales.

As it relates to the topic of abortion, Raisner testified that Mayday does not sell, handle, provide, or offer abortion pills for sale. Rather, "Mayday provides information free of charge so that women can, if they choose, terminate pregnancies safely even though they live in places like South Dakota

---

[1] No transcript has been prepared of the preliminary injunction hearing. The information from the hearing included in this order derives from an audio recording and the Court's memory.

that limit or outlaw abortion." *Id.* ¶ 6. Raisner further testified that Mayday does not recruit anyone to commit an illegal act or advocate that a person do anything specific; rather, Mayday spreads accurate information about abortion pills. Raisner agreed that Mayday links the websites for abortion pill merchants on Mayday's website. However, he claimed that Mayday does so to inform people that they have choices.

According to Raisner, Mayday is not compensated in any way by the abortion pill merchants, and Mayday does not benefit if a woman goes to the Mayday website and then to an abortion pill merchant's website. Mayday does not "charge any fee, collect any revenue related to providing medical or legal services, obtain any other valuable consideration in exchange for disseminating information, benefit from the sale of abortion medication, have any customers, or monetize the data of people who use its website." *Id.* ¶ 7.

In furtherance of its mission to provide information about abortion pills, Mayday placed signs in December 2025, such as the following, at various gas stations in South Dakota:



*Id.* ¶ 9.

In response, Governor Larry Rhoden urged Attorney General Marty Jackley to investigate the signs, and on December 10, 2025, Attorney General Jackley issued Mayday a cease-and-desist letter. Docket 5-2; Exhibit 2. In the letter, Attorney General Jackley claimed that Mayday's "advertisement directs South Dakota consumers to resources that insinuate abortion-inducing pills are legal in South Dakota, while also urging women not to seek medical care after taking abortion pills and to keep their abortion a secret." Docket 5-2 at 1. He accused Mayday of engaging in a deceptive act or practice under SDCL chapter 37-24. *Id.* at 2. He demanded that Mayday "**IMMEDIATELY CEASE AND DESIST** from conducting any advertising related to the delivery of abortion drugs to the State of South Dakota." *Id.* He threatened that a failure to comply could result in "felony criminal consequences or civil penalties up to $5,000 per violation." *Id.*

Mayday responded by letter, disagreeing with the claim that its advertising and website violates South Dakota law. Docket 5-3. Mayday asserted that the First Amendment protects its speech and claimed that it "will continue to make important, and truthful, public information available." *Id.* at 2.

On December 22, 2025, the State of South Dakota filed a motion in South Dakota state court against Mayday, seeking a preliminary and permanent injunction to enjoin Mayday from engaging in its "advertisement of abortion-inducing pills and abortion services." Docket 5-4. The motion alleged that "[a]n investigation into Mayday Health's advertisements uncovered a

4

plethora of deceptive acts and practices, false pretense[s], false promises, or misrepresentations, and the concealment, suppression, or omission of material facts in connection with the advertisement of abortion-inducing pills and abortion services; the sale of abortion related merchandise; and in the solicitation of contributions for charitable purposes, in violation of S.D.C.L. 37-24-6." *Id.* at 2.

In response, Mayday, which is headquartered in New York, brought suit in the United States District Court for the Southern District of New York against Attorney General Jackley in his official capacity for injunctive and declaratory relief. Docket 5-7. Mayday claimed that although Attorney General Jackley had filed an injunction motion in South Dakota state court, he did not properly serve the motion on Mayday or file or serve any complaint or summons on Mayday. *Id.* at 10. Mayday, in its New York federal lawsuit, alleged § 1983 claims for violation of its First Amendment rights. *Id.* at 11–14.

The New York district court held a hearing on January 29, 2026. Docket 1 ¶ 22. Attorney General Jackley asserted that Mayday's speech is criminal and therefore not protected by the First Amendment as Mayday contends. *Id.* Ultimately, the federal district court dismissed Mayday's suit under *Younger v. Harris*, 401 U.S. 37 (1971), finding that abstention applies. Docket 5-13 at 2. However, in dicta, the court noted that it would have found that Mayday's speech is protected by the First Amendment. *Id.*

On February 18, 2026, the Attorney General's Office, on behalf of the State of South Dakota, filed a complaint against Mayday in South Dakota state

5

court for injunctive and declaratory relief. Docket 5-12. The State claimed that

"Mayday Health advertises and solicits the sale of illegal abortion pills" and

"connects people to resources that sell and deliver illegal abortion pills into the

State of South Dakota." *Id.* ¶¶ 44, 48. It included the following photo in its

complaint:



*Id.* ¶ 28.

The State asserted that Mayday's illegal advertising campaign is not

protected speech and is instead deceptive advertising in violation of SDCL § 37-

24-6. *Id.* ¶¶ 42–54. The State asked the court to declare that Mayday's

advertisements violate South Dakota's Deceptive Trade Practices Act and issue

an injunction barring Mayday from engaging in deceptive advertising within

South Dakota. *Id.* at 10–11.

While the state lawsuit was pending, the State and Mayday executed a

"Limited Release Agreement" on March 5, 2026. Docket 5-14. The parties

agreed to fully resolve "any and all actual and potential claims, causes of

action, and disputes the Parties may have regarding the South Dakota Action and the New York Action[.]" *Id.* at 2. This included dismissing their respective lawsuits. *Id.* Mayday also agreed to "ensure the removal of the Gas Station Placards" and "terminate its campaign to place additional Gas Station Placards throughout South Dakota." *Id.* Further, Mayday agreed, "going forward," that "it will not place, either directly or indirectly through third-party actions, any signs, posters, placards, billboards, or other physical media within the physical borders of South Dakota that aid, abet, or solicit illegal conduct as established by law." *Id.*

On March 9, 2026, the South Dakota Senate passed House Bill 1274 as amended. Docket 1 ¶ 28. Thereafter, the House of Representatives concurred in the amendments, and Governor Rhoden signed the bill at a press conference on March 30, 2026. *Id.* After the press conference, Governor Rhoden issued a press release, noting his effort with the Attorney General "to stop illegal advertisements of these pills[.]" *Id.* ¶ 31. He claimed that "HB 1274 allows the Attorney General to actually prosecute the shipment of pills for purposes of an unlawful abortion." *Id.*

HB 1274 took effect on July 1, 2026. The bill added the following new section to SDCL chapter 22-17:

> No person may knowingly dispense, distribute, sell, or advertise any of the following for purposes of an unlawful abortion pursuant to § 22-17-5.1:
>
> (1) An article or thing designed, adapted, or intended for producing an abortion; or

7

> (2) An article, instrument, substance, drug, medicine, or thing that is advertised or described in a manner calculated to lead another to use or apply it for producing an abortion.

A violation of this section is a Class 6 felony.

SDCL § 22-17-5.3; Docket 5-15. The bill further amended SDCL § 22-17-5.1 to provide: "Any person who administers to any person or who prescribes or procures for any person any medicine, drug, or substance or uses or employs any instrument or other means with intent thereby to procure an abortion, unless there is appropriate and reasonable medical judgment that performance of an abortion is necessary to preserve the life of the pregnant female is guilty of a Class 6 felony." Docket 5-15.[2] Notably, under SDCL § 22-17-5.2, "[a] female who undergoes an unlawful abortion, as set forth in § 22-17-5.1, may not be held criminally liable for the abortion."

On May 29, 2026, Mayday and Turbak (the Plaintiffs) filed a complaint in this Court against Governor Rhoden and Attorney General Jackley (the Defendants) in their official capacities, seeking an injunction barring the Defendants' enforcement of HB 1274 against them. *See generally* Docket 1. The Plaintiffs argue that without Court intervention, they will be deterred from engaging in protected speech under the First Amendment and self-censor to avoid the likelihood of felony prosecution under South Dakota law. *Id.* ¶¶ 33,

---

[2] SDCL § 22-17-5.1, as currently codified, provides: "Any person who administers to any person or who prescribes or procures for any person any medicine, drug, or substance or uses or employs any instrument or other means with intent thereby to procure an abortion, as defined in § 34-23A-1, unless there is appropriate and reasonable medical judgment that performance of an abortion is necessary to preserve the life of the pregnant female, is guilty of a Class 6 felony."

38; Docket 4 at 6. Because HB 1274 became law on July 1, 2026, the Court will refer to the codified law—SDCL § 22-17-5.3—rather than the house bill number.

The Plaintiffs assert three claims. First, they allege that SDCL § 22-17-5.3 is unconstitutional under the First Amendment as applied to them. Docket 1 ¶ 40. Next, they assert that the "advertise" prohibition in the statute is unconstitutional on its face under the First Amendment because it prohibits or chills a substantial amount of protected speech. *Id.* ¶ 43. Lastly, the Plaintiffs allege that the statute, as applied to Mayday, violates the Communications Decency Act because the Legislature intends it to be applied to Mayday. *Id.* ¶ 50.

The Plaintiffs request that the Court grant an injunction preventing the Defendants from enforcing or threatening to enforce SDCL § 22-17-5.3 against them and declare that the statute is unconstitutional as applied to Mayday and Turbak, that it violates Section 230 as applied to Mayday, and that the "advertise" prohibition is unconstitutional on its face. *Id.* at 19 (request for relief).

The Plaintiffs filed a motion for a preliminary injunction. Docket 3. The Defendants filed a motion to dismiss Turbak's claims for lack of standing. Docket 14. They also opposed the Plaintiffs' motion for a preliminary injunction, Docket 16, and filed an answer to the complaint, Docket 27.

The Court held an evidentiary hearing on the request for a preliminary injunction on June 23, 2026, and at the hearing heard arguments on the

Defendants' motion to dismiss. Docket 43. At the hearing, the Court questioned whether the parties intended it to be one on the merits, thereby consolidating the trial on the merits and the preliminary injunction hearing under Federal Rule of Civil Procedure 65(a)(2). The Plaintiffs requested such consolidation, and the Defendants objected. The Court declined to consolidate the matter under Rule 65(a)(2) based on the Defendants' need to conduct more discovery on the merits.

The Court addressed additional preliminary matters, including the Plaintiffs' motion to strike a supplement filed by the Defendants, and the parties' respective motions in limine. Dockets 29, 32, 34, and 41. The Court denied the Plaintiffs' motion to strike, Docket 34, but gave them an opportunity to submit a written response to the supplement following the hearing. The Court also denied, in all but one respect, both parties' motions in limine, Dockets 32 and 41. The Court granted the Plaintiffs' motion in limine, Docket 32, related to evidence about Mayday's supporters and donors. Although the Defendants did indicate an intent to present evidence of Mayday's supporters and donors, the Court concluded that such evidence would not be relevant to the matter at hand.

During the hearing, the Plaintiffs presented witness testimony from Turbak and Raisner and rebuttal testimony from Raisner and Dr. Marvin Buehner. Docket 43 at 2. The Defendants presented witness testimony from DCI Agent Kayla Klemann and Dr. Patricia Giebink. *Id.* Both sides presented extensive documentary evidence. Dockets 45 and 46. Thereafter, the Court

heard arguments from counsel and asked questions to further clarify the parties' respective legal positions. The Court took the matter under advisement and allowed further briefing as requested by the parties. The Court now issues the following order resolving all pending motions.

## SPOLIATION MOTION

Prior to the preliminary injunction hearing, the Defendants had submitted, in support of their opposition to the preliminary injunction, an affidavit by Agent Klemann recounting her exploration of the Mayday website, including pages from her use of a chatbot named "Charley." Docket 16-1. The Defendants' exhibit list also indicated that the Defendants would be relying on printouts of pages from Mayday's website. Docket 26.

On June 22, counsel for Plaintiffs filed an affidavit with the Court relating that he had advised counsel for the Defendants on June 21, that Mayday removed the Charley chatbot from its website. Docket 35. During the hearing on the preliminary injunction, Raisner testified that he decided to remove the chatbot because, after looking more closely, the language of the chatbot went beyond Mayday's mission. Raisner testified that neither the Charley chatbot nor any similar chatbot would be hosted on Mayday's website in the future.

The Defendants sought to admit evidence of the Charley chatbot during Agent Klemann's testimony. However, the Plaintiffs objected because the chatbot is no longer part of Mayday's website, and in their view, the preliminary injunction request should look only at the circumstances as they

11

currently stand. In response, the Defendants argued that evidence concerning the chatbot is admissible because the Charley chatbot existed at the time the Plaintiffs filed their lawsuit and, in their view, just because it is removed now does not mean it will never be part of the website in the future. The Defendants further argued that the Charley chatbot exhibits are relevant evidence of Mayday's state of mind and criminal intent.

The Court admitted the Defendants' exhibits depicting Agent Klemann's use of the Charley chatbot with the understanding that the evidence is part of Agent Klemann's investigation and with the understanding that the Charley chatbot is no longer part of Mayday's website. The Court also granted the Defendants' request to provide post-hearing briefing on the question whether Mayday's removal of the Charley chatbot warrants further relief by the Court.

On June 26, 2026, the Defendants filed a motion for spoliation remedy, Docket 47, arguing that Mayday removed the chatbot "to prevent the state from using Chatbot Charley evidence at trial[,]" Docket 48 at 2. The Defendants further claim prejudice by Mayday's removal of the chatbot because, in their view, the Charley chatbot is evidence of Mayday's intent to facilitate an illegal drug transaction and thus evidence that Mayday's advertising violates SDCL § 22-17-5.3. *See generally* Docket 48. The Defendants request that the Court order "either (1) temporary access to Chatbot Charley so that the state can take pictures of the quotes in question or (2) admit Exhibit JJ." *Id.* at 6.

The Plaintiffs disagree that the removal of the Charley chatbot constitutes spoliation of evidence. Docket 50 at 5. They note that the

Defendants' exhibit list was due on June 18, and Mayday did not delete the chatbot until June 21. *Id.* Thus, according to the Plaintiffs, the Defendants "had plenty of evidence" of the chatbot, and there is no support for their argument that Mayday deleted the chatbot to prevent the state from using it at trial. *Id.* at 4–5. The Plaintiffs further claim that the Defendants were not prejudiced by Mayday's deletion of the chatbot because the Defendants' chatbot evidence was admitted at trial and whether an injunction should issue depends on the facts as they exist today and not on what the website contained in the past. *Id.* at 7–8.

"'Spoliation' is the 'intentional destruction, mutilation, alteration, or concealment of evidence.'" *Chappell v. SRT Express, Inc.*, No. 5:24-CV-05068-ECS, 2026 WL 1413200, at *1 (D.S.D. May 20, 2026) (quoting *Spoliation*, Black's Law Dictionary (11th ed. 2019)). "A spoliation-of-evidence sanction requires 'a finding of intentional destruction indicating a desire to suppress the truth.'" *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (quoting *Stevenson v. Union Pac. R.R. Co.,* 354 F.3d 739, 746 (8th Cir. 2004)). It is within this Court's discretion to determine intent based on circumstantial evidence, credibility, and other factors. *Id.*

Having listened to the testimony of the witnesses and arguments of counsel, the Court finds Raisner's testimony credible that the decision to remove the Charley chatbot was based on determination that the chatbot did not align with Mayday's mission. Therefore, the Court does not find that

13

Mayday removed the chatbot to thwart the Defendants' use of that evidence at a trial in this case.

The Court further finds that the Defendants were not prejudiced in this case by the removal of the Charley chatbot from Mayday's website. *See Stevenson*, 354 F.3d at 748 ("There must be a finding of prejudice to the opposing party before imposing a sanction for destruction of evidence."). The Court accepted into evidence the Defendants' exhibits detailing Agent Klemann's use of the Charley chatbot on Mayday's website, and Agent Klemann was able to testify about the same. But more importantly, the Plaintiffs' lawsuit, seeking to enjoin the enforcement of SDCL § 22-17-5.3 against them, is forward looking and thus requires this Court to consider the Plaintiffs' intended speech, not its past speech. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (looking at the petitioners' statements they intend to make in the future when considering a pre-enforcement challenge to a law); *Inst. for Free Speech v. Jackley*, 340 F. Supp. 3d 853, 859–60 (D.S.D. 2018) (examining what the plaintiff plans to publish on its website).

The Court recognizes that past speech can bear on the question of intended future speech. But here the Court accepts as true Raisner's testimony that Mayday will not host the Charley chatbot or a similar chatbot on its website now or in the future. Therefore, whether the First Amendment protects

14

Mayday's speech via the Charley chatbot need not be decided, and imposing a spoliation sanction would be unwarranted.[3]

**STANDING**

The Defendants filed a motion to dismiss Turbak's claims for lack of standing. Docket 14. Although the Defendants did not file a similar motion to dismiss Mayday's claims for lack of standing, they asserted in their answer to the Plaintiffs' complaint, Docket 27, and at the evidentiary hearing that Mayday lacks standing to pursue its claims. Because standing is a jurisdictional prerequisite to the Court's consideration of the Plaintiffs' claims, the Court must address standing. *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 799 (8th Cir. 2006) (explaining that standing is "an inescapable threshold question"); *Murthy v. Missouri*, 603 U.S. 43, 56 (2024) ("Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'").

To establish standing, the Plaintiffs must show an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and "likely" to "be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (citation modified). Whether a party has shown an injury in fact "often turns on the nature and source of the claim asserted." *Warth v. Seldin,*

---

[3] The Defendants' spoliation motion also requests that the Court order the Plaintiffs to preserve, "if not already irretrievably deleted, . . . the Charly [sic] chatbot as it was in the days leading up to this trial." Docket 48 at 6. While the Court declines to issue such a directive because the Defendants have not identified anticipated future litigation, the Court nevertheless reminds Mayday of its obligation to preserve evidence that a party knows is relevant to future or current litigation. *See Chappell*, 2026 WL 1413200, at *1.

422 U.S. 490, 500 (1975). "To show an injury in fact in a First Amendment pre-enforcement case, a plaintiff must have 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1072 (8th Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)); *see also First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026).

"A plaintiff can establish an injury in the First Amendment context in two ways: by identifying protected speech in which it would like to engage but that is proscribed by statute, or by self-censoring to avoid the credible threat of prosecution." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022) (citation omitted). "[W]hen a course of action is within the plain text of a statute, a 'credible threat of prosecution' exists." *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (citation omitted); *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 604 (8th Cir. 2013) (finding standing when "plaintiff alleges an intention to engage in a course of conduct that is clearly proscribed by statute" even when there is no "specific threat of enforcement" (citation omitted)).

The Plaintiffs bear the burden of establishing standing. *Murthy*, 603 U.S. at 56. "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Id.* at 58 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

16

The Plaintiffs contend that SDCL § 22-17-5.3 "adds more criminal arrows to the State's quiver" than existed before the statute's enactment, and "[t]he Attorney General's actions and statements prove he intends to use those new weapons against Mayday and against anyone like Turbak who engages in the same speech as Mayday." Docket 4 at 31. At the evidentiary hearing, Turbak testified that she is making a billboard of herself by wearing the Mayday sweatshirt to advertise information that abortion pills are available in all 50 states and to advertise a website source to get answers and information. She also testified that she fears prosecution for wearing the sweatshirt. Raisner testified that Mayday is not engaging in the speech it wants to because of SDCL § 22-17-5.3.

The Plaintiffs thus argue they have established an injury in fact because "Mayday and Turbak would engage in speech protected by the First Amendment"; yet, they "intend to censor themselves to avoid the criminal and civil penalties" of SDCL § 22-17-5.3. Docket 4 at 8. Finally, in their view, "[t]he general enforcement powers of the Governor and Attorney General satisfy the causation and redressability elements of standing." *Id.* at 9.

## I.    Turbak's Standing

The Defendants assert that Turbak does not have standing to challenge SDCL § 22-17-5.3 because the law does not, on its face, criminalize the wearing of a Mayday sweatshirt. Docket 15 at 1. According to the Defendants, the word "advertise" in the statute describes advertising in the "sense of 'attracting customers' or 'recommending [abortion pills] to another person for

17

h[er] acquisition.'" *Id.* at 2 (alterations in original) (citation omitted). The Defendants then claim that Turbak "is not wearing her Mayday sweatshirt to 'attract customers' or consummate a woman's 'acquisition' of abortion pills for the obvious reason that she is not in the position to sell or supply abortion pills to anyone." *Id.* at 2–3. Rather, in the Defendants' view, Turbak would be engaging in mere passive expression, lacking the requisite criminal scienter. *Id.* at 3. The Defendants therefore contend that Turbak "can fearlessly wear her Mayday sweatshirt with all the blessings and protections the First Amendment allows." *Id.* at 5.

While the Defendants cast the message on Turbak's Mayday sweatshirt as mere advocacy, the message her sweatshirt conveys is markedly similar to the message on Mayday's gas station placards—a message that the Defendants argue would violate South Dakota law, including SDCL § 22-17-5.3. *See generally* Docket 16. To be sure, both Turbak's message on her sweatshirt and Mayday's message on the placards advertise and provide a means to learn more from Mayday's website, which informs consumers about obtaining abortion pills. *Compare* Docket 1 ¶ 34 (sweatshirt message: "You can still get ABORTION PILLS *in all 50 states* Learn More at Mayday.Health"), *with id.* ¶ 9 (placard advertisement: "PREGNANT? DON'T WANT TO BE? Learn more at Mayday.Health"). Moreover, the Defendants use the same structure as Turbak's Mayday sweatshirt to emphasize their position regarding the impermissible nature of Mayday's advertisement. *See* Docket 16 at 26 (Defendants claiming that Mayday's message is the same as: "*They don't want you to know to this*:

18

You can still get METHAMPHETAMINE *in all 50 states* Learn more at Methday.High.").

Importantly, although the Defendants state that Turbak can wear her sweatshirt without fear of prosecution, the Defendants have not disavowed the State's authority to prosecute Turbak or persons like Turbak under SDCL § 22-17-5.3, and they have not indicated an intent to never enforce the statute against Turbak. *See Students for Life Action v. Jackley*, 746 F. Supp. 3d 668, 684 (D.S.D. 2024) (noting that defendants did not take a "formal position—let alone signed a stipulation for a permanent injunction against prosecution"); *Inst. for Free Speech*, 340 F. Supp. 3d at 860 (declining to rely on the attorney general's representations because doing so places the plaintiff's First Amendment rights at the mercy of the attorney general).

Further, "[b]ecause standing is jurisdictional, this Court must evaluate standing generally, not confined to just those standing arguments a defendant makes." *Students for Life*, 746 F. Supp. 3d at 679. And, here, SDCL § 22-17-5.3 makes no distinction between advertisements by nonprofits like Mayday or by persons like Turbak. Rather, the statute makes it a crime for *any person* to advertise for purposes of an unlawful abortion. SDCL § 22-17-5.3. Therefore, Turbak has shown a credible threat of prosecution under SDCL § 22-17-5.3 that justifies her claim that self-censorship exists. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011).

19

## II.    Mayday's Standing

The Defendants argue that Mayday lacks standing because it agreed not to advertise abortion pills in South Dakota in the parties' release agreement. In the release executed by Mayday and the Defendants prior to this lawsuit, Mayday expressly agreed, "going forward," that "it will not place, either directly or indirectly through third-party actions, any signs, posters, placards, billboards, or other physical media within the physical borders of South Dakota *that aid, abet, or solicit illegal conduct as established by law.*" Docket 5-14 at 2 (emphasis added). It also agreed to "ensure the removal of the Gas Station Placards and will terminate its campaign to place additional Gas Station Placards throughout South Dakota." *Id.*

The language of this release does not read as broadly as the Defendants contend. Mayday did not disclaim all rights to advertise abortion pills in South Dakota. It agreed not to advertise in a way that aids, abets, or solicits illegal conduct as established by law and agreed to end its campaign of placing additional placards at gas stations in South Dakota. Therefore, if, as Mayday contends, its speech is deemed protected by the First Amendment, then its speech would fall outside the scope of the release. As such, the Court finds that Mayday, like Turbak, has asserted a particularized injury that is the result of the State's actual or threatened enforcement of SDCL § 22-17-5.3.

The Court further concludes that the injury to the Plaintiffs is fairly traceable to SDCL § 22-17-5.3 because the injury—burden on the Plaintiffs' First Amendment rights—is linked to the Attorney General's authority to

20

enforce the statute against them. *See Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 881 (D.S.D. 2019) ("[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." (alteration in original) (citation omitted)). Also, the injury can be redressed by enjoining the enforcement of or declaring unconstitutional SDCL § 22-17-5.3. Therefore, the Plaintiffs have established standing to challenge SDCL § 22-17-5.3.

## PRELIMINARY INJUNCTION MOTION

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "A preliminary injunction is an 'extraordinary remedy,' and the burden of establishing that injunctive relief should enter rests with the movant." *Oglala Sioux Tribe v. United States*, 674 F. Supp. 3d 635, 643–44 (D.S.D. 2023) (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

"No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue." *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006). However, consideration of the "likelihood of success on the merits is most significant." *Turtle Island Foods,*

21

*SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Laclede Gas Co. v. St. Charles Cnty.*, 713 F.3d 413, 419–20 (8th Cir. 2013)). To meet this factor on a challenge to the implementation of a state statute, the movant must show more than a "fair chance" of success on the merits; the standard requires "a showing that the movant 'is likely to prevail on the merits.'" *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (*en banc*) (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). Because the question whether there is a likelihood of prevailing on the merits depends on the type of speech, if any, regulated by SDCL § 22-17-5.3, the Court first addresses the parties' arguments in that regard.

### I.    Type of Speech

The Plaintiffs contend that their speech is of public concern and is thus at the heart of the First Amendment. Docket 4 at 10 (noting that abortion is "a profound moral question"). *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 234 (2022) (recognizing that Americans "hold passionate and widely divergent views on abortion, and state legislatures have acted accordingly"). They also argue that SDCL § 22-17-5.3 regulates speech based on content because it applies to a topic discussed—abortion—and the idea or message that the Plaintiffs express. *Id.* at 10–11. According to the Plaintiffs, because the statute regulates speech based on content, it is subject to strict scrutiny. *Id.* at 11.

The Defendants focus only on Mayday's speech because, as indicated in their written submissions and arguments at the evidentiary hearing, they do

22

not believe that Turbak's speech violates SDCL § 22-17-5.3. However, as the Court has concluded, Turbak has standing to challenge the constitutionality of SDCL § 22-17-5.3 as applied to her intended speech. Nevertheless, because Turbak's Mayday sweatshirt message is sufficiently similar to the type of messaging Mayday would use on its physical media, the Court does not at this juncture separately address Turbak's Mayday sweatshirt message.

Turning then to Mayday's intended speech, the Defendants contend that it is entitled to no protection under the First Amendment, and further, that even if the speech is protected, it is not entitled to protection under heightened scrutiny. Docket 16 at 20. They claim that Mayday:

- offers to provide abortion pills whether as part of a commercial transaction or not;
- accompanies its advertising with inducements to transfer of [ sic] child abortion drugs from one person to another;
- recommends abortion drug suppliers with the intent of initiating a transfer;
- encourages and induces a violation of the law;
- intends to bring about a particular unlawful act;
- recommends how (by mail) and when (within a certain number of weeks post-LMP) illegal abortion drug acquisition and ingestion be done;
- furnishes the means for obtaining illegal abortion drugs.

*Id.* at 11 (citations omitted).

At the evidentiary hearing, the Defendants argued that SDCL § 22-17-5.3 is targeted at conduct, not speech. However, the Defendants also characterized Mayday's speech as "at best a mix of commercial and non-commercial speech and at worst speech integral to the commission of a crime." Docket 16 at 9. To support that Mayday's speech is commercial, the Defendants argue that Mayday "fundraise[s] off its illegal advertising," and "Mayday's advertisements

. . . 'directly relate to [its] ability to fundraise and, in turn, to buy more advertisements.'" *Id.* at 13, 20 (citation omitted). The Defendants also note that Mayday sells merchandise on its website.

Finally, the Defendants argue that Mayday's speech is integral to criminal conduct because Mayday's advertisements actively solicit and facilitate the illegal purchase of abortion pills in South Dakota. *Id.* at 15 (claiming that "Mayday's advertising is directed solely at initiating transactions to ship abortion pills into 'places like South Dakota' for the purpose of inducing an abortion there"). In particular, the Defendants highlight that Mayday advertises that abortion pills are available in all 50 states and then provides links to the website for abortion pill merchants. *Id.* at 17–18. According to the Defendants, Mayday advertises for purposes of an unlawful abortion by walking women through the process of obtaining abortion pills.

The First Amendment, which applies to state government through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. "The First Amendment envisions the United States as a rich and complex place where all enjoy the freedom to think as you will and to speak as you think." *Chiles v. Salazar*, 146 S. Ct. 1010, 1020 (2026) (citation modified). In protecting these freedoms, the United States Supreme Court "has long held that laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.'" *Id.* at 1021 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

24

The Defendants do not appear to dispute that SDCL § 22-17-5.3 as applied to the Plaintiffs regulates their speech based on its communicative content—abortion. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Laws that restrict such speech trigger "strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest[.]" *Id.* at 171 (citation modified).

However, there are exceptions to the application of this demanding standard. *Chiles*, 146 S. Ct. at 1021–22. For example, the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Also, "laws regulating conduct in ways that incidentally sweep in speech" do not trigger strict scrutiny. *Id.* at 1022 (citing *Nat'l Inst. of Fam. and Life Advoc. v. Becerra*, 585 U.S. 755, 769 (2018)). And the First Amendment accords no protection to speech that is integral to criminal conduct. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)). To be sure, "speech integral to criminal conduct" falls "outside the scope of the First Amendment." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (citation modified).

### a. Commercial Speech

Commercial speech has been defined as "expression related solely to the economic interests of the speaker and its audience[,]" *Cent. Hudson Gas*, 447 U.S. at 561, or "speech that does no more than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65–66 (1983). The Defendants have not shown that Mayday's speech proposes a commercial transaction or that the speech is related solely to Mayday's or its audience's economic interests.

However, just because speech "cannot be characterized merely as proposals to engage in commercial transactions" does not mean Mayday's speech is non-commercial. *See Bolger*, 463 U.S. at 66. Rather, the Court next considers whether the speech has commercial and non-commercial purposes sufficient to nonetheless be characterized as commercial. *See Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999). For this type of inquiry, the Court considers the three factors identified by the Eighth Circuit from the United States Supreme Court, namely "(i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Id.* at 1120 (citing *Bolger*, 463 U.S. at 66–67). "The combination of *all* these characteristics . . . provides strong support for the . . . conclusion that [the communication is] properly characterized as commercial speech." *Bolger*, 463 U.S. at 67.

26

The parties agree that Mayday's speech constitutes an advertisement. *See* Docket 4 at 4; Docket 16 at 11. However, at this stage of the litigation, the Defendants have not shown that Mayday's advertisement is commercial speech. *See City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 419 (1993) (recognizing the inherent difficulty in drawing bright lines that clearly cabin commercial speech; the inquiry is fact-intensive). While Mayday links abortion pill merchant websites on its own website—thereby referring to a specific third-party that provides a product—Mayday does not sell, handle, or distribute abortion pills for these third-party providers. This weighs against finding the speech commercial. *See Bolger,* 463 U.S. at 66 n.13 (noting that the mailings refer specifically to products manufactured by the appellee). Further, there is no evidence that Mayday holds an economic motivation for its advertisements. *See, e.g., Nat'l Inst. of Fam. and Life Advocates v. James,* 160 F.4th 360, 375 (2d Cir. 2025) (noting that the speaker received no fee, commission, or other remuneration for referring to third-party providers). Rather, the evidence and testimony establish that Mayday is a nonprofit organization expressing a moral belief and providing information for free.

Finally, although Mayday fundraises and sells merchandise on its website to further its nonprofit mission, there is no evidence that Mayday receives payment for linking the websites for abortion pill merchants on its own website. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 266 (1964) (concluding that the advertisement was not commercial even though it "sought financial support on behalf of a movement whose existence and objectives are

matters of the highest public interest and concern"). Similarly, the Defendants have not established that Mayday's advertisements are directly related to its ability to fundraise and thus operate. *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017) (concluding that the service provider's advertisements constitute commercial speech even though the provider does not charge a fee for client services, in part because the success of the advertisements directly relates to employee compensation).

### b. Conduct Regulation

In the Defendants' answer, they contend that "[t]he statute regulates conduct—not protected speech—and any incidental impact on expression is constitutionally permissible." Docket 27 at 2. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney,* 336 U.S. at 502. While SDCL § 22-17-5.3 targets conduct by banning the dispensing, distributing, and selling of anything for purposes of an unlawful abortion, the focus of the Plaintiffs' as-applied challenge is the statute's prohibition on *advertising*. The statute in this regard is directed at the dissemination of information based on its content—abortion—and therefore cannot be said to only incidentally burden speech. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 620 (2020) (looking at whether the focus of the law forbids "*speaking* about a particular topic"); *Holder v. Humanitarian Law Project*, 561

28

U.S. 1, 28 (2010) (finding that while the law may be aimed at conduct, as applied to the plaintiffs, the triggering conduct is the communicative message).

### c. Speech Integral to Criminal Conduct

The Defendants' briefing largely focuses on Mayday's website and describes in detail a hypothetical woman's experience while accessing Mayday's website to learn about abortion pills, including use of the Charley chatbot. Docket 16 at 4–7. At the evidentiary hearing, Agent Klemann testified about the investigation she conducted into Mayday's advertisements preceding the 2025 lawsuits that are the subject of the parties' release. She concluded based on her investigation that Mayday targets its advertising at states, like South Dakota, with stricter abortion laws. She also came to the opinion that some of the information on Mayday's website is misleading as it relates to the timeframes Mayday states that abortion pills are still safe. She noted that Mayday does not indicate on its website that abortions are illegal in South Dakota.

In regard to abortion services, Agent Klemann agreed that Mayday's website connects people with abortion pill providers. She then testified that based on her experience navigating Mayday's website, Mayday promoted the direct links to allow her to be able to get abortion pills. She further testified that based on her understanding from the information on Mayday's FAQ website page, abortion pill providers use telehealth to prescribe women

abortion pills.[4] On cross-examination, Agent Klemann agreed that the offer to purchase abortion pills she observed during her investigation was not through Mayday's website.

The Defendants also offered extensive testimony from Dr. Patricia Giebink about the misleading nature of Mayday's messaging on its website about abortion pills, noting in particular the information on when it is safe to use an abortion pill. The Defendants questioned Dr. Giebink about Aid Access's website—an abortion pill merchant linked on Mayday's website—and she opined that Aid Access's website contains information that conflicts with FDA guidelines. Dr. Giebink also testified about instances wherein women in South Dakota have taken or obtained abortion pills and have sought advice about them or have experienced complications. In her view, the use of telemedicine for abortion pills is increasing in South Dakota, and a woman buying abortion pills online is not doing so with informed consent.

On cross-examination, Dr. Giebink agreed that an authorized medical provider who prescribes an abortion pill by telehealth is, similar to a provider in an in-person visit, assessing and balancing the risks and benefits of the

---

[4] Agent Klemann referred to a "Mail Forwarding" page purportedly on Mayday's website, which she claimed Mayday used to inform users to set up a fake address to forward abortion pills to South Dakota and then walked users through the process to accomplish mail forwarding. Through cross-examination, Agent Klemann testified that she obtained the "Mail Forwarding" page from a Google search, not Mayday's website. During rebuttal testimony, Raisner explained that the "Mail Forwarding" page is not part of Mayday's current website and has not been part of Mayday's website since 2023. The Court declines to consider the "Mail Forwarding" page and related testimony because it is not part of Mayday's intended speech for which it seeks First Amendment protection.

drug. She also agreed that a medical provider that prescribes an abortion pill must get the patient's informed consent. Finally, she agreed that the FDA has removed the in-person dispensation requirement for abortion pills. Through rebuttal testimony by Dr. Marvin Buehner, the Plaintiffs presented evidence supporting the efficacy of the information on Mayday's website, including that abortion pills are safe. Dr. Buehner also opined that the numbers are "astoundingly small" for adverse events from taking abortion pills.

Based on the Defendants' documentary evidence and the testimony of its witnesses, they argued that Mayday's advertising crosses the line from protected speech into speech integral to criminal conduct.[5] In their view, "Mayday's advertising does not simply inform viewers where abortion is legal or where abortion drugs may legally be purchased and ingested to produce an abortion[.]" Docket 16 at 17. Rather, the Defendants argue that Mayday has adopted the speech of the third parties it links on its website by calling them

_____

[5] The Defendants raised in their answer, Docket 27 ¶ 30, and then asserted at the evidentiary hearing that the language of SDCL § 22-17-5.3 is based on the language of the Federal Comstock Act. *See* 18 U.S.C. § 1461. Under that Act, "[e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose . . . [i]s declared to be nonmailable matter" and the United States Postal Service may not lawfully deliver. *Id.* Other than arguing that certain language in SDCL § 22-17-5.3 is based off the Comstock Act, the Defendants did not present evidence that Mayday uses the mails in a manner prohibited by the Comstock Act. Moreover, the Comstock Act is a federal statute, not a state law for which Attorney General Jackley has authority to enforce. Finally, as one court noted, since 1915, the Comstock Act has been understood to apply to the use of the mails in an illegal manner, and therefore, the Department of Justice has not enforced the Act against the mailing of prescription drugs. *See, e.g., GenBioPro, Inc. v. Sorsaia*, No. 3:23-0058, 2023 WL 3211847, at *7 (S.D. W. Va. May 2, 2023) (noting cases and further noting the Department of Justice's position that it will not enforce the Comstock Act against legal vendors of mifepristone).

31

trusted partners. Thus, according to the Defendants, "Mayday is simply a front to advertise for abortion pill merchants what they cannot advertise for themselves in South Dakota." *Id.* at 18.

In response, the Plaintiffs contend that the Defendants' "admission that the First Amendment does not allow it to criminalize Turbak wearing a Mayday sweatshirt that conveys Mayday's message—namely that abortion pills are available in all states, and that more information is available at Mayday Health—torpedoes the State's argument" that Mayday's speech is criminal because "Mayday's speech does not solicit or facilitate an illegal abortion any more than Turbak's speech does." Docket 31 at 9. In any event, the Plaintiffs further argue that while Mayday provides links to other entities on its website—entities that provide abortion pills—Mayday "only makes information available; it does not advocate that anyone take an abortion pill; it does not 'incit[e]' anyone to do anything, and nothing it does can produce 'imminent lawless action.'" *Id.* at 11–12 (alteration in original). The Plaintiffs also assert that Mayday "obtains no benefit of any kind if a woman goes from its website to another website and decides to purchase abortion pills." *Id.* at 11. Therefore, in their view, Mayday is not a middleman "except in the sense that anyone who provides information about anything to anyone is a middleman." *Id.* at 13.

"Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008); *Giboney*, 336 U.S. at 502. Likewise, "[s]peech intended to bring about a particular unlawful act has no social value" and "is unprotected." *United States*

*v. Hansen*, 599 U.S. 762, 783 (2023). However, "there remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality." *Williams*, 553 U.S. at 298–99. To be sure, just because speech encourages criminal activity does not mean it is unprotected. *See id.* at 299–300 (noting, for example, that "I encourage you to obtain child pornography" is protected). Rather, for speech to exceed the bounds of protection, the speech must "intend[] to bring about a particular unlawful act[,]" *Hansen*, 599 U.S. at 783, or be "directed to inciting or producing imminent lawless action and is likely to incite or produce such action[,]" *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

It is undisputed that it would be unlawful under SDCL § 22-17-5.3 for an abortion pill merchant to advertise its abortion-producing pills in South Dakota because such advertising would clearly be for purposes of an unlawful abortion pursuant to SDCL § 22-17-5.1.[6] But Mayday is not an abortion pill merchant and it does not sell, dispense, or distribute abortion pills. Further, while Mayday advertises that abortion pills can be obtained in all 50 states and provides links on its website to the websites for abortion pill merchants, Mayday does not facilitate the transfer of or offer to transfer abortion pills into South Dakota. Nor does the evidence establish that Mayday's desired speech is

---

[6] Under SDCL § 22-17-5.1, "[a]ny person who administers to any person or who prescribes or procures for any person any medicine, drug, or substance or uses or employs any instrument or other means with intent thereby to procure an abortion" absent a limited exception, "is guilty of a Class 6 felony."

33

intended to produce unlawful abortions or incite imminent lawless action.[7] Rather, Mayday's evidence at this juncture establishes that it spreads what it believes to be accurate information about abortion pills, including links to abortion pill merchants, with the intent of informing people that they have choices and to provide education about those choices.

The Defendants, however, assert that Mayday's speech is nevertheless integral to criminal conduct because Mayday is akin to a newspaper publishing a want ad for prostitution. Docket 16 at 9 (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rels.*, 413 U.S. 376 (1973)). While the United States Supreme Court explained in *Pittsburgh Press* "that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes[,]" the speech at issue in *Pittsburgh Press* concerned the placement of employment (not prostitution) advertisements into separate columns for women only, men only, and women or men. *Id.* at 379–81, 389. The Court in *Pittsburgh Press* held that the advertisements constituted commercial speech and examined the regulation at issue under less demanding scrutiny. *Id.* at 389.

Here, the Court has concluded that Mayday's advertisement is not commercial speech. Further, unlike the ordinance at issue in *Pittsburgh Press*, SDCL § 22-17-5.3 does not contain a provision governing when a person is alleged to have aided in the doing of the act declared unlawful by the statute.

_____

[7] If a woman does undergo an unlawful abortion in South Dakota, she cannot be held criminally liable. SDCL § 22-17-5.2.

34

*See* 413 U.S. at 378 (making it unlawful "[f]or any person, whether or not an employer, employment agency or labor organization, to aid . . . in the doing of any act declared to be an unlawful employment practice by this ordinance . . . ." (second and third alterations in original) (citation omitted)). Therefore, the Court does not find *Pittsburgh Press* particularly instructive in this case.

Seemingly drawing on the "aid" language in *Pittsburgh Press*, the Defendants contend that Mayday's "advertising" is integral to criminal conduct because it aids and abets in violation of SDCL § 22-3-3 and solicits in violation of SDCL § 22-4A-1. Docket 16 at 27–28. Under SDCL § 22-4A-1, "[a]ny person who, with the intent to promote or facilitate the commission of a crime, commands, hires, requests, or solicits another person to engage in specific conduct which would constitute the commission of such offense or an attempt to commit such offense, is guilty of criminal solicitation." Under SDCL § 22-3-3, "[a]ny person who, with the intent to promote or facilitate the commission of a crime, aids, abets, or advises another person in planning or committing the crime, is legally accountable, as a principal to the crime." Both of these criminal statutes require that the defendant act with the intent to promote or facilitate the commission of a crime. *See State v. Thoman*, 955 N.W.2d 759, 769–71 (S.D. 2021) (examining SDCL § 22-4A-1 and the crime of aiding and abetting). The Court therefore looks at the evidence presented at the hearing.

Raisner acknowledged during cross-examination that he was quoted in a media statement that Mayday targeted its advertising in South Dakota because of its strict abortion laws. However, he clarified that Mayday did so because of

35

the lack of access to information in South Dakota. He also stated on direct examination that Mayday aims through its advertising to provide accurate information about abortion pills and other subjects, including morning after pills, birth control, and gender affirming care. Raisner agreed on cross-examination that providing links on its website to abortion pill merchants makes it easier to learn that providers of abortion pills exist. However, he testified that Mayday does not recruit anyone to do anything, does not attempt to influence anyone's choice to have an abortion, and does not recommend anyone commit an illegal act. He also testified that the reference to "trusted sources" on Mayday's website does not mean that Mayday is promoting abortion pills; rather, he claimed that because there is a lot of information out there that is not trustworthy, Mayday's reference to trusted sources indicates that the information on its website can be trusted. The Court finds Raisner's testimony on these matters credible.

Mayday's website further supports that it does not advertise with the specific intent to promote or facilitate the commission of a crime. On its website, Mayday identifies:

> Our mission is to share information about abortion pills, birth control, and gender-affirming care in any state. We hope to empower people to make their own informed decisions about their own bodies.
>
> Our information comes from top clinicians, lawyers and health experts.
>
> Mayday does not ask for any personal info. We do not track info that could be used to identify a visitor to this website. We do not sell, handle or benefit from abortion pills. We are not affiliated with any telehealth providers. We do not give medical or legal advice.

36

We just want people to know their options.

Docket 46 at 39 (Exhibit R).

When a consumer goes to Mayday's website, the page displays, "What do you need?" followed by four options: Abortion, Morning after pills, Birth Control, Gender-Affirming Care. *Id.* at 10 (Exhibit D). If a user clicks on "Abortion," they are taken to a new page that lists five abortion pill providers. *Id.* at 17–19 (Exhibit E). The page also includes a "FAQs" section with the following questions: "How are health care providers able to get me pills?"; "Questions about costs, legal risk, and websites we link out to?"; and "Want more information and other ways to get pills?" *Id.* at 19.

The Defendants entered into evidence an exhibit depicting the answer to the first question:

> Shield laws offer protection for doctors, nurses and other practitioners in abortion-friendly states who prescribe and send abortion pills to people living in other states that ban or severely restrict abortion. In many states, these laws protect prescribers and patient data, helping patients in other states access abortion pills online from the prescribers. For more information on shield law prescribers, visit the Abortion Coalition for Telemedicine.

*Id.*

The Defendants also entered into evidence a separate "Frequently Asked Questions" page from Mayday's website. *Id.* at 40 (Exhibit S). For the question, "Are abortion pills safe?" the website provides: "According to the World Health Organization, abortion pills are safe and effective in the first 12 weeks of pregnancy. If you are 12 weeks more [sic] pregnant we link to ineedana, a trusted source which has information on abortion procedures and care after 12

37

weeks." *Id.* For the question, "Why do other buttons send me to other websites? Can I trust them?" the website provides: "Some of our links go to other websites because they have the best content for a certain aspect of abortion care. We only link to other trusted websites and partners. You can go <u>here</u> to see how to best protect your digital privacy before leaving Mayday." *Id.*

Based on the evidence presented and the Court's credibility assessment of Raisner's testimony, the Defendants have not shown that Mayday advertises with the specific intent that another person engage in specific criminal conduct and thus have not shown that Mayday's advertising is integral to criminal conduct. Also, the Defendants have not shown that either Mayday's physical media or Turbak's Mayday sweatshirt (which both contain messages with less detail than Mayday's website) advertise with the specific intent to promote or facilitate the commission of a crime. The speech by Mayday and Turbak in this regard makes no offer to provide unlawful material and does not advocate to incite or promote imminent, unlawful action.

The Court notes that the Defendants, in their briefing, distinguish the cases relied on by the Plaintiffs. Docket 16 at 12–15. In the Defendants' view, the Plaintiffs' cases in most respects support the Defendants' position that Mayday's speech is not protected under the First Amendment.[8] Docket 16 at 12. For example, the Defendants contend that *Bigelow v. Virginia*, 421 U.S. 809

---

[8] The Court leaves for the future the Defendants' argument that the cases relied on by the Plaintiffs in support of their claim that the advertise prohibition in SDCL § 22-17-5.3 is unconstitutionally overbroad are likewise distinguishable because the Court does not in this order address the overbreadth claim.

(1975), stands for the proposition that it would be permissible for Mayday to advertise in South Dakota that abortion is legal in a state where it is legal, but that Mayday may not advertise in South Dakota that an abortion is available in a state, like South Dakota, where it is illegal. *Id.* at 12. The Court does not read *Bigelow* as the Defendants do. In that case, the Supreme Court specifically declined to decide "the precise extnet [sic] to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate or even prohibit." 421 U.S. at 825. Moreover, the speech at issue in *Bigelow* was commercial. *Id.* at 826. Therefore, *Bigelow* neither helps nor works against either the Defendants or the Plaintiffs in this case.

The Defendants also contend that *James*, 160 F.4th 360, is inapplicable here because the speech about abortion reversal pills in that case was made in New York, and in New York, abortion reversal pills are not illegal. Docket 16 at 13. There is no language in *James* specifically addressing the legality of abortion reversal pills in the context of the speech at issue. *See generally* 160 F.4th 360. Rather, the case largely addressed whether the speech subject to restriction was commercial. *Id.* Ultimately, the Second Circuit Court of Appeals upheld the district court's determination that the speech at issue is non-commercial and thus entitled to First Amendment protection. *Id.* at 375. In this Court's view, *James* is instructive only insofar as it relates to the question whether Mayday's speech is commercial and not on the question whether Mayday's speech is integral to criminal conduct.

39

In sum, as it relates to the Plaintiffs' intended speech as established at the evidentiary hearing, the Defendants have not shown at this stage of the litigation that the Plaintiffs' intended speech is commercial speech, conduct rather than speech, or speech integrally related to unlawful conduct. *See New York Times,* 376 U.S. at 266; *Holder*, 561 U.S. at 28; *Brandenburg,* 395 U.S. at 448; *Williams*, 553 U.S. at 298–99. Rather, the Court concludes that the Plaintiffs' speech is speech and SDCL § 22-17-5.3 regulates the Plaintiffs' speech based on its content. As such, strict scrutiny applies. *See People for the Ethical Treatment of Animals, Inc. v. Reynolds,* 173 F.4th 959, 966 (8th Cir. 2026) (noting that an as-applied challenge looks at whether the speech at issue is protected and whether the law is content based before deciding the level of scrutiny to apply).

## II.    Likelihood of Success on the Merits on Count I

The Plaintiffs argue that SDCL § 22-17-5.3 fails strict scrutiny because it "criminalizes Mayday and Turbak's lawful speech" and further that it "is neither narrowly tailored nor serves a compelling state interest." Docket 4 at 11–12. At the preliminary injunction stage, the Defendants did not attempt to satisfy strict scrutiny. And the record is devoid of evidence suggesting that the standard could be met. Importantly, although the Defendants argue that abortion pills are not safe and the information provided by Mayday on its website is misleading, Mayday presented evidence supporting the efficacy of abortion pills and statistical information denoting minimal adverse events. The differing views on the subject by the parties do not evince that forbidding the

Plaintiffs' speech is necessary to achieve the Defendants' interests. The Court therefore concludes that the Plaintiffs have shown a likelihood of success on the merits of their claim that to the extent SDCL § 22-17-5.3 reaches their intended speech, it is unconstitutional as applied to them.[9]

### III.   Remaining Preliminary Injunction Factors

The Defendants' arguments as to the remaining factors depend on this Court holding that Mayday's speech is not protected at all under the First Amendment because it is integral to criminal conduct or that the speech is commercial and deserving of less protection. Docket 16 at 18–22. From that perspective, the Defendants claim the preliminary injunction factors have not been met. *Id.* at 19–26.

"Generally, if a party shows a 'likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied.'" *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (alteration in original) (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (*en banc*)). Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Therefore, the Court finds that

---

[9] In light of this determination, the Court need not address in this order the Plaintiffs' additional causes of action and arguments in favor of granting a preliminary injunction. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (noting that the plaintiff need only establish a likelihood of success on one claim).

granting a preliminary injunction to enforce the Plaintiffs' First Amendment rights outweighs any potential harm to the Defendants. Also, the public interest is served by issuing an injunction because the public has a compelling interest in protecting its First Amendment rights. *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) ("[T]he public interest, as reflected in the principles of the First Amendment, is served by free expression on issues of public concern.").

## IV.    Whether this Court should impose a bond

After considering the relevant factors and that the Defendants have not requested a bond be posted, the Court exercises its discretion to waive the bond requirement under Federal Rule of Civil Procedure 65(c). *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (noting that the Eighth Circuit has approved the waiving of bond based on "the important public interest in the enforcement" of the federal law at issue).

Accordingly, it is hereby

ORDERED that Plaintiffs' motion for preliminary injunction, Docket 3, is granted only to the extent that the Defendants are enjoined pending the disposition of the case on its merits from enforcing SDCL § 22-17-5.3 against Mayday and Turbak. It is further

ORDERED that Defendants' motion to dismiss, Docket 14, is denied. It is further

42

ORDERED that Defendants' motion for spoliation remedy, Docket 47, is denied. It is further

ORDERED that no bond shall be required.

Dated July 17, 2026.

BY THE COURT:

/s/ *Camela C. Theeler*

CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE