# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| MAYDAY HEALTH and NANCY TURBAK BERRY,<br>　　　Plaintiffs,<br><br>v.<br><br>LARRY R. RHODEN, Governor for the State of South Dakota, and MARTY J. JACKLEY, Attorney General for the State of South Dakota, in their official capacities,<br>　　　Defendants. | 4:26-CV-04096-CCT<br><br>DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR STAY OF PRELIMINARY INJUNCTION PENDING APPEAL |

## INTRODUCTION

Defendants, Governor Larry R. Rhoden and Attorney General Marty J. Jackley, by and through their counsel, Amanda J. Miiller, Jacob R. Dempsey and Paul S. Swedlund, hereby file this brief in support of Defendants' motion to stay the preliminary injunction entered in this case. This Court has enjoined a duly enacted state criminal statute without performing a proper legal analysis of speech integral to criminal conduct and incitement, without considering relevant and highly probative evidence of intent, without the required common sense balancing of commercial speech, without proper interpretation and application of controlling precedent, without holding Mayday to its burden of proving a likelihood of success on the merits, and without determining the true applicability of the statute as to Nancy Turbak Berry.

As a result, the Court has legalized the solicitation and aiding and abetting of an illegal drug and erroneously broadened the scope of the term

advertising.  The Court's reasoning and ruling could just as easily protect the solicitation and aiding and abetting of online methamphetamine sales by groups who claim to simply "provide information" about methamphetamine and offer consumers the "choice" to commit an illegal act.  "Providing information" by way of solicitation and aiding and abetting is conduct integral to the commission of a criminal act and supplying the means to carry that act out is incitement, which is not protected speech.  Period.  And the statute does not apply at all to Turbak Berry.  Accordingly, Defendants respectfully request a stay of the Court's preliminary injunction of SDCL 22-17-5.3 as applied to Mayday and Turbak Berry pending the State's appeal.

## BACKGROUND

In 2026, the South Dakota Legislature enacted House Bill 1274, which was signed into law and codified, as it pertains to this proceeding, in SDCL 22-17-5.3.  H.B. 1274, 2026 Leg., 101st Sess. (S.D. 2026).  The new law became effective on July 1, 2026.  *Id.*  The law is based on the Federal Comstock Act, which is entitled "Mailing Obscene or Crime-Inciting Matter."  Doc. 27, para. 30; *see also* 18 U.S.C.A. § 1461 (West).  The Act prohibits the mailing of:

> Every article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and
>
> Every article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose; and
>
> Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or

made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means abortion may be produced, whether sealed or unsealed; and

Every paper, writing, advertisement, or representation that any article, instrument, substance, drug, medicine, or thing may, or can, be used or applied for producing abortion, or for any indecent or immoral purpose; and

Every description calculated to induce or incite a person to so use or apply any such article, instrument, substance, drug, medicine, or thing[.]

18 U.S.C.A. § 1461.

Recently, in the wake of *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022), General Counsel for the United States Postal Service issued an official advisory opinion regarding the applicability of the Act to the mailing and advertisement of abortion-inducing articles.  Ex. 1, Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions, Slip Opinion, (2022).  While the opinion concludes that the Act does not prohibit the mailing, delivery, or receipt of abortion-inducing drugs, it does so only because "there are manifold ways in which recipients in every state may use these drugs, including to produce an abortion, without violating state law."  *Id.* at 2.  However, this justification only applies "where the sender lacks the intent that the recipient of the drugs will use them unlawfully."  *Id.* at 1-2.  The opinion goes on to note that the Act "could be constitutionally applied to the mailing of drugs *intended* to produce abortions."  *Id.* n.5 (emphasis added).  The opinion further acknowledges "that state law, as well as federal, is relevant to the application of the [Act]."  *Id.*

3

With the understanding that 100% of abortions[1] in the State of South Dakota are now accomplished through telemedicine[2] and the procurement of abortion drugs sent through the mail, and a further understanding that the application of the Act depends on 1) the requisite intent of the sender; and 2) the application of state law, the South Dakota Legislature enacted House Bill 1274 to stop the flow of illegal abortion drugs into the State.  Ex. 2, p. 7; https://societyfp.org/research/wecount/wecount-december-2025-data/ (last accessed July 28, 2026).  That law, which mirrors the Act, provides:

> No person may knowingly dispense, distribute, sell, or advertise any of the following for purposes of an *unlawful* abortion pursuant to § 22-17-5.1:
>
> (1)    An article or thing designed, adapted, or intended for producing an abortion; or
>
> (2)    An article, instrument, substance, drug, medicine, or thing that is advertised or described in a manner calculated to lead another to use or apply it for producing an abortion.
>
> A violation of this section is a Class 6 felony.

SDCL 22-17-5.3 (emphasis added).  The present challenge followed.

## LEGAL STANDARD

"A stay pending appeal . . . has functional overlap with an injunction, particularly a preliminary one."  *Kansas v. United States*, 124 F.4th 529, 532

---

1.    It is illegal to administer, prescribe, or procure "any medicine, drug, or substance" with the intent "to procure an abortion . . . unless there is appropriate and reasonable medical judgment that performance of an abortion is necessary to preserve the life of the pregnant female."  SDCL 22-17-5.1.
2.    It is illegal to administer abortion pills via telemedicine for the purpose of inducing an abortion.  SDCL 36-4-8, -47, and -48.

(8th Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 428, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)).  Accordingly, the same four-factor test for a stay pending appeal is applied to a request for stay of a preliminary injunction.  *Id.* at 533.  The four-factor test is:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Brakebill v. Jaeger*, 905 F.3d 553, 557 (8th Cir. 2018) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987)).  "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required."  *Id.* (citing *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011)).  In balancing these factors, "[c]lear evidence of irreparable injury should result in a less stringent requirement of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury."  *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011) (quoting *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir.1984)).  When the balance weighs in the applicant's favor, a stay is appropriate.  *Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control*, 999 F.2d 145, 147 (8th Cir. 1993).

## ARGUMENT

### 1. Success on the Merits

#### A. Illegal Speech

5

"What do you need?"  This is the opening line of Mayday's website.  If the answer to that question were "methamphetamine" and Mayday then provided a link to a seller willing to ship methamphetamine into South Dakota where it is illegal, there is no principled argument that Mayday has not solicited,[3] or aided and abetted[4] an illegal drug transaction in South Dakota.  But, according to this Court's order, because the answer is "abortion pills," Mayday gets to skirt the laws.  On this basis alone, Defendants are likely to succeed on the merits of an appeal of the Court's preliminary injunction.  Defendants' likelihood of success increases when the flaws in the Court's reasoning and ruling are exposed.

As a preliminary matter, the Court conflated the standards it applied regarding the State's illegal speech claims, that being speech integral to criminal conduct and incitement.[5]  Doc. 51 at 26-40.  Speech integral to

---

3. Solicitation is accomplished when "[a]ny person who, with the intent to promote or facilitate the commission of a crime, commands, hires, requests, or solicits another person to engage in specific conduct which would constitute the commission of such offense or an attempt to commit such offense."  SDCL 22-4A-1.

4. Aiding, abetting, or advising is accomplished when "[a]ny person who, with the intent to promote or facilitate the commission of a crime, aids, abets, or advises another person in planning or committing the crime." SDCL 22-3-3.

5. For example, in the legal standards portion of the Court's analysis on speech integral to criminal conduct, after acknowledging that criminal speech is unprotected, it provided the following caveats:

> Rather, for speech to exceed the bounds of protection, the speech must "intend to bring about a particular unlawful act[,]" *Hansen*, 599 U.S. at 783, or be "directed to inciting or producing imminent lawless action and is likely to incite or produce such action[,]" *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

criminal conduct and incitement were both alleged by the State.  These are two separate doctrines that require independent analysis before commercial speech should be evaluated.

Speech integral to a crime inquires whether the speech itself is a means of the crime—it focuses on the speaker's own act, regardless of intent, and not the subsequent acts of others.  *United States v. Arthur*, 160 F.4th 597, 609 (4th Cir. 2025).  Accordingly, acts such as aiding and abetting, *Arthur*, 160 F.4th at 609, and solicitation, *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010), are unprotected because the act, itself, is criminal.  Incitement, on the other hand, inquires whether speech is likely to cause imminent lawless action by others.  It requires both intent and a probability of imminent harm.  *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015).  The erroneous application of these standards was an abuse of discretion, and it is likely Defendants will prevail on the merits when the standards are correctly applied on appeal.

### I.  Speech Integral to Criminal Conduct

The commingled standard used by the Court caused it to interpose a heightened intent element where it does not exist, focus on the subsequent acts of others, and then to treat Mayday's conduct as protected speech while disregarding the well-established rule that the First Amendment does not

---

Doc. 51 at 33.  Likewise, in the Court's conclusions it states, "Defendants have not shown that Mayday advertises with the specific intent that another person engage in specific criminal conduct."  Doc. 51 at 38.  However, these principles only apply to incitement.

shield speech "used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 688, 93 L. Ed. 834 (1949).  Additionally, the Court failed to analyze the State's claim that Mayday's advertising violates the State's Deceptive Trade Practices Act, as well as other criminal provisions.  It is an abuse of discretion for a Court to decline to decide an issue.  *Petrone v. Werner Enters., Inc.*, 42 F.4th 962, 969 (8th Cir. 2022).

The Court's decision was primarily based on Mayday's self-serving testimony that it "does not sell, handle, provide, or offer abortion pills for sale." Doc. 51 at 2, 27, 33, 36.  At no point have Defendants ever asserted that Mayday directly does any of those things; if it did, they would be charged as a principal, and not for soliciting or aiding and abetting.  Nevertheless, the Court ultimately concluded that Mayday does not solicit or aid and abet because it does not "offer to provide unlawful material[,]" that being abortion pills.  Doc. 51 at 38.

Solicitation and facilitation do not require that Mayday actually "sell, handle, or distribute abortion pills."  Doc. 51 at 27, 33.  In *United States v. Jackson*, 482 F.2d 1264, 1267 (8th Cir. 1973), the court affirmed the defendant's conviction for aiding and abetting a cocaine deal when the evidence established the defendant's role in "bringing the buyer and seller together." The Eighth Circuit has consistently held "that neither possession nor an actual sale by a [middleman] need be proved by the government on a charge of . . . aiding and abetting the distribution of drugs."  *United States v. Hernandez*, 986

8

F.2d 234, 238 (8th Cir. 1993).  Thus, in *United States v. Anziano*, 606 F.2d 242, 245 (8th Cir. 1979), the court affirmed an aiding and abetting conviction of a middleman defendant to a methamphetamine transaction when the defendant introduced undercover law enforcement buyers to a seller and arranged for the buyers and seller to meet to consummate the transaction.  The *Anziano* Court ruled that for aiding and abetting it was "not significant that [the defendant] did not personally have the drug in his possession at any time or that the sale was actually consummated by" the seller.  *Anziano*, 606 F.2d at 245.

Importantly, as a factual matter, Mayday absolutely does "offer to provide" abortion pills.  That is Mayday's reason for being—to advertise abortion pills on behalf of merchants who cannot advertise for themselves.  And when Mayday asks, "What do you need?" and provides the option to select abortion pills, that constitutes solicitation.  It is Mayday's offer that makes it a part of the supply chain in the sale of illegal abortion pills.  There is no difference between Mayday's solicitation of abortion pills than that of a street pusher who asks, "Wanna score some meth?" and then directs the individual to a stash house, or in Mayday's case, the third-party merchants.

The same reasoning equally applies to Mayday's aiding and abetting in the sale of abortion pills.  In just two clicks of a mouse, a buyer is immediately connected with an abortion pill merchant willing to break the law.  This is because Mayday's website is inherently structured in a way that directly facilitates these sales.  On immediate entry to the website, Mayday asks "What

do you need?"  Hearing Ex. D.  The term "abortion" is prominently displayed. *Id.* When a user clicks on the "abortion" link, they are instantly directed to Mayday's page that reads "Order from" and then lists five abortion pill merchants willing to ship illegal abortion pills into the State of South Dakota. Hearing Ex. E.  The Court concluded that "referring [Mayday site users] to a specific third-party that provides a product" is perfectly harmless and legal. Doc. 51 at 27.  But that is only true if the "product" is legal, which it is not here.  Referring buyers "to a specific third-party that provides a[n illegal] product" is the very definition of aiding and abetting an illegal drug transaction.  *Jackson*, 482 F.2d 1267; *Hernandez*, 986 F.2d at 238; *Anziano*, 606 F.2d at 245.

Particularly when the evidence of Mayday's intent, which the Court refused to consider, is factored into the analysis.  Mayday's lawsuit may be "forward looking" because it wants to conceal evidence of its intent, but the question of the intent behind "statements [Mayday] intend[s] to make in the future" is not limited to prospective evidence.  *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014).  Past statements illuminate Mayday's present intent, particularly when, as described above, the plain intent of Mayday's website is to connect buyers with sellers willing to conduct illegal transactions in only two clicks of a mouse.  Removing the Mail Forwarding instructions and Chatbot Charley from its website hasn't changed Mayday's intent, it has only concealed overt expressions of it.  Hearing Ex. D-Q and 29.  Mayday's intent is still facially evident from its own website.

Connecting users with third-party abortion pill merchants is the core function of Mayday's website.  Mayday's testimony denying this fact, which the Court found "credible," is very obviously not an accurate description of what Mayday does:

- When Mayday says it targeted its advertising to South Dakota because of a "lack of access to information," it means a "lack" of "information" on how to illegally ship pills into the state;
- When Mayday says its "aim" is to provide "accurate information about abortion pills," it means "accurate information" on how to illegally ship pills into the state;
- When Mayday says its website just "makes it easier to learn that abortion pills exist," it actually goes beyond informing site users that abortion pills *exist* by informing users how to purchase the pills illegally;
- Though Mayday says its website does not recruit, influence, or recommend the commission of an illegal act, that is *exactly* what it does.  By asking "What do you need?" and then filling that need by brokering the illegal sale of what the user "needs" recruits the buyer into a transaction.  Soft-peddling the illegality of the transaction influences the buyer to proceed with it.  Recommending pills as categorically safe and "trusted" partners who will supply them recommends an illegal transaction and influences users to proceed with it; and
- When Mayday says that referencing "trusted" pill providers is only countering information that is "not trustworthy," not "promoting abortion pills," Mayday glosses over the fact that representing itself as a source of "trustworthy" information intrinsically promotes the abortion pill transactions offered by its website.

In each of these statements, Mayday describes only *part* of what it does. These statements cannot be taken at face value.  The Court fails to read between the lines and judge these statements in comparison to what Mayday *does* as opposed to what it *says*.  Mayday's website provides no "information" about abortion pills in the two-click process other than who "ships [them] to all 50 states," and cost and delivery information.  That is all Mayday *does*; it instantly connects buyers with sellers willing to conduct illegal transactions within South

Dakota's borders.  If, consistent with what Mayday's website *does,* Mayday had testified honestly and completely that the aim of its advertising campaign is simply to provide "accurate information about [illegal mail-order purchases of] abortion pills" and to "make it easier to learn that [illegal mail-order] abortion pills exist [and who sells them]," then the conclusion that its speech is integral to illegal activity, and sufficiently transactional to be "conduct . . . that incidentally sweep[s] in speech," is inescapable.  *Nat'l Inst. Of Fam. And Life Advoc. v. Becerra,* 585 U.S. 755, 769 (2018).  Mayday's omissions of the full extent of its "aim[s]" from its testimony are intrinsically not credible or deserving of strict scrutiny, meaning that Defendants have a strong likelihood of prevailing on the merits of an appeal.

Despite this, the Court concluded that Mayday lacked the "the specific intent that another person engage in specific criminal conduct" and the "specific intent to promote or facilitate the commission of a crime."  Doc. 51 at 38.  It is unclear whether it did so using a conflated legal standard, *see, e.g., supra* n.5, or under its statutory analysis of SDCL 22-3-3 and SDCL 22-4A-1.  Doc. 51 at 35.  Herein lies the rub.  Regardless, the Court abused its discretion in the former by misapplying a legal standard, and in the latter by dismissing direct and overwhelming evidence of intent.

In sum, Mayday's conduct falls squarely within *Giboney.*  336 U.S. at 498.  The record shows Mayday does more than express views—they direct users to sources of abortion pills and facilitate acquisition.  That is not "mere advocacy."  It is the functional equivalent of solicitation or aiding-and-abetting

conduct, which has never enjoyed constitutional protection. The Court effectively collapsed this distinction. By characterizing Mayday' activity as "providing information," it ignored SDCL 22-17-5.3's purpose requirement and the conduct's operative effect—connecting individuals to unlawful services. That analytical shift effectively nullifies *Giboney*. When speech is transactional, targeted, and designed to produce an unlawful result, it falls outside the First Amendment. SDCL 22-17-5.3 regulates precisely that category. As a result, Defendants have shown a likelihood of success on the merits on appeal.

In addition to the conflated legal analysis, the Court also failed to analyze and make a ruling on the remaining evidence presented regarding illegal conduct. At the hearing, the Court took judicial notice of the following state criminal laws, which Defendants asserted Mayday had violated:

- SDCL 22-17-5.1 - Procurement of abortion prohibited--Exception—Penalty
- SDCL 22-4A-1 - Criminal solicitation—Penalty
- SDCL 22-3-3 - Aiding, abetting or advising--Accountability as principal
- SDCL 37-24-6 - Deceptive act or practice--Penalty.
- SDCL 22-3-8 - Conspiracy to commit offense—Punishment
- SD HB 1318, from the 2022 Legislative Session and SDCL 36-4-8, 36-4-47, and chapter 34-23A – An Act to prohibit medical abortion by telemedicine and to increase the penalty for the unlicensed practice of medicine when performing a medical abortion
- SDCL 34-23A-7 - Forty-eight hour notice to parent or guardian for minor or incompetent female--Delivery of notice—Exceptions (criminalized via SDCL 34-23A-10.2)

Of this list, when the Court addressed whether Mayday's speech was integral to criminal conduct, it only looked to whether Mayday engaged in the solicitation and aiding and abetting of abortion pill sales. Doc. 51, pgs. 29-40.

13

The Court failed to analyze whether Mayday's advertising constitutes a deceptive act or practice, the illegality of using telemedicine to procure abortion pills, whether there are sufficient safeguards to ensure that sales of pills of minors occur with the required parental notification, and whether Mayday was engaged in a criminal conspiracy with its self-professed "trusted partners," the abortion pill merchants.

The most glaring omission is the lack of analysis and decision on the Deceptive Trade Practices Act. In South Dakota, it is a crime to "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes[.]" SDCL 37-24-6. Indeed, this was the original basis for South Dakota's complaint for injunctive relief against Mayday in state court. Doc. 51 at 6. Mayday settled this matter, agreeing to remove its gas station advertisements in South Dakota, terminate its campaign, and refrain from posting further advertisements "that aid, abet, or solicit illegal conduct as established by law." Doc. 51 at 7.

Defendants produced significant evidence at the hearing regarding Mayday's deceptive acts and practices such as 1) advertising to consumers that abortion pills are "available in all 50 states" without advising them that the pills are illegal and that it is illegal to use telemedicine to procure them; 2) advertising websites that affirmatively assure consumers that the procurement and use of abortion pills is legal; 3) advertising to consumers that abortion pills

14

are FDA approved but then failing to abide by FDA guidelines on their use; and 4) advertising and soliciting abortions for minors without the required parental notification. *See also* Doc. 51 at 29-30.

These misrepresentations and omissions all fall within the purview of deceptive acts and practices. Defendants maintain that this analysis should have been done under its speech integral to criminal conduct claim. This is because SDCL 37-24-6 criminalizes the act of committing a deceptive act or practice; thus the act, itself, is criminal. *Arthur,* 160 F.4th 597, 609. Moreover, SDCL 37-24-6 contemplates both commercial and non-commercial transactions in that it prohibits deceptive acts and practices in connection with 1) the sale of any merchandise, 2) the advertisement of any merchandise, and 3) "the solicitation of contributions for charitable purposes[.]" Failing to analyze and decide the deceptive acts and practices claim, as well as other claims,[6] is an abuse of discretion. *Petrone,* 42 F.4th at 969. Accordingly,

---

6.  For instance, regarding conspiracy, Defendants introduced evidence that Mayday publicly holds out their abortion pill merchants as "trusted partners." Conspiracy requires 1) two or more persons, 2) an agreement to commit any offense against the State, and 3) an overt act by one of the parties. SDCL 22-3-8. Mayday and the abortion pill merchants are two separate entities. Mayday publicly holds itself out as partners with the abortion pill merchants listed on its website. Mayday advertises for the abortion pill merchants and provides direct links to its website to facilitate the sale of abortion pills. It is a crime to sale abortion pills in the State of South Dakota. It is a crime to use telemedicine to procure abortion pills in the State of South Dakota. This is a partnership because the two do not succeed without each other. The abortion pill merchants cannot legally advertise without Mayday and Mayday's website is currently designed to advertise and facilitate abortion pill sales.

Defendants have demonstrated a likelihood of success on the merits in this regard.

## II. Incitement

In its legal standard, the Court correctly noted that "for speech to exceed the bounds of protection, the speech must 'intend to bring about a particular unlawful act[,]' or be 'directed to inciting or producing imminent lawless action and is likely to incite or produce such action[.]'" Doc. 51 at 33 (citations omitted). The Court then summarily concluded that the evidence did not "establish that Mayday's desired speech is intended to produce unlawful abortions or incite imminent lawless action." Doc. 51 at 33. It did so without any analysis whatsoever. Other than mirroring the same conclusion later in its decision, Doc. 51 at 38, the Court made no other references to this claim. Because there is a complete lack of analysis as to the Court's reasoning, Defendants are left in a position where they are unable to assess the Court's basis for this conclusion and make an argument. Defendants contend this complete lack of analysis further demonstrates the error made by the Court when it conflated the standards of speech integral to criminal conduct and incitement. As a result, Defendants have demonstrated a likelihood of success on the merits regarding this issue on appeal.

## B. Commercial Speech

Assuming, arguendo, that Mayday's speech is protected, it is commercial speech that cannot survive when the proper framework is applied. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557,

16

564–65, 100 S. Ct. 2343, 2350, 65 L. Ed. 2d 341 (1980). The Supreme Court has long recognized "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Id.* at 562. Commercial speech may be regulated because "of the greater potential for deception or confusion in the context of certain advertising messages." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65, 103 S. Ct. 2875, 2879, 77 L. Ed. 2d 469 (1983).

Throughout the proceeding, Defendants maintained that Mayday's speech constitutes "mixed speech," at best. Accordingly, the Court applied the necessary *Bolger* factors to categorize Mayday's speech. But the Court's rigid application showed no yield to the flexibility of the factors and vitiated the regulatory rationale meant to protect against deception and confusion. Based on the required 'commonsense' distinction that must be made, and in light of the protective rationale against deception and confusion, the Court's conclusion that Mayday's speech is fully protected non-commercial speech cannot stand. The advertisement, solicitation, and facilitation of illegal drug sales in contravention of state laws simply cannot stand.

While the Court applied the proper test, it failed to acknowledge that the *Bolger* factors are "just a general framework" that "no one factor is sufficient," and that "*Bolger* strongly implied that all [factors] are not necessary." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014). The first factor of

17

whether Mayday's speech is an advertisement is not in dispute.  Doc. 51 at 27. This factor weighs in favor of Defendants.

However, the Court went on to conclude that Mayday's advertisements do not refer to a specific product or service.  Doc. 51 at 27.  It did so on the previously mentioned faulty logic that "Mayday does not sell, handle, or distribute abortion pills."  *Id.*  Again, this logic is unsound and leads to the same absurd result in the analysis for illegal speech—it could just as easily protect online methamphetamine sales by groups who claim to simply "provide information" about methamphetamine and offer consumers the "choice" to commit an illegal act.  Such a conclusion simply defies "commonsense," which should be the lodestar in making this determination.  Further, as a factual matter, Mayday absolutely refers to a specific product, abortion pills, and then identifies five specific abortion pill merchants of its choosing.  Hearing Ex. D and E.

The Court similarly lost its course by too narrowly construing the economic motivation factor.  While the Court's decision focuses on the alleged fact that Mayday does not receive payment from the abortion merchants it advertises for, this is not a prerequisite of commercial speech.  Mayday can realize an economic benefit from its speech from sources other than advertising or drug sales revenues.  Donations and fundraising are an economic benefit and a motivator.  But in one conclusory sentence, the Court dismisses the economic motivation behind Mayday's advertisements.  *See* Doc. 51 at 27.

18

At the outset, the finding that "there is no evidence that Mayday holds an economic motivation for its advertisements" is hard to square with the evidence presented that Mayday, itself, touts that it is "entirely funded by donations and merchandise sales." *Compare* Doc. 51 at 27 *with* Hearing Ex. AA. Moreover, according to *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 377 (2d Cir. 2025), evidence of "capital increase through fundraising" is evidence of "economic benefit" to Mayday from "engaging in this speech." Mayday solicits and receives donations specifically off its message of delivering abortion pills to all 50 states. Those donations pay salaries at Mayday and for all the advertising on billboards, trucks, blimps, airplane banners and gas station placards. Donations that "directly relate to [Mayday's] ability to fundraise and, in turn, [allow it] to buy more advertisements" is an economic motivation that the Court simply ignores. *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017). And *New York Times* clearly does not support a lack of economic motivation here because Mayday is pushing an illegal product, not simply funding a *lawful* movement message, such as that abortion pills are legal in Minnesota and South Dakota women can legally buy and induce abortion with them there. *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964).

When Mayday's speech is properly framed as commercial, it is then subject to intermediate scrutiny for commercial speech regulations. *Central Hudson*, 447 U.S. 557 (1980). This four-part test requires: (i) the speech concerns lawful activity and is not misleading; (ii) the governmental interest is

19

substantial; (iii) the regulation directly advances that interest; and (iv) the regulation is not more extensive than necessary. *Id.*

Mayday's website easily fails this test: (i) the sale of abortion pills in South Dakota is illegal (this, alone, ends the analysis); (ii) the State's interest in the life, health, and safety of pregnant women and their unborn children is well recognized by the United States Supreme Court and the State's interest in enforcing its criminal laws, and preventing circumvention of its abortion regulations are unquestionably substantial; (iii) shutting down advertising for an illegal transaction and in furtherance of a scheme to supply abortion pills directly advances the State's interest; and (iv) the statute is narrowly drawn because it does not ban discussion of abortion, advocacy, or general information and only targets purpose-driven advertising tied to illegal conduct, i.e., it "reaches no further than the purposeful solicitation and facilitation of specific acts known to violate [South Dakota] law." *Hansen*, 599 U.S. at 781.

When the standards for commercial speech are applied in a "commonsense" manner and with due regard to the protective rationale against deception and confusion, Defendants have demonstrated a likelihood of success on the merits as to this issue.

### C. The Court's Attempts to Distinguish Persuasive Authority is Unavailing

The Court's order does not give full force and weight to *Pittsburgh Press*, *Bigelow*, and *James* based on untenable distinctions that make no legal difference. The Court concluded that *Pittsburgh Press*'s categorical statement

20

about constitutionally permissible prohibitions on advertisements for illegal transactions like prostitution or controlled drugs is "not . . . particularly instructive" simply because the statement appears in the context of an equal opportunity decision about the lack of heightened protection due to gender-segregated employment ads.  Doc. 51 at 34-35.  This distinction is not a basis for disregarding *Pittsburgh Press* because its holding rested on the proposition that, because employment discrimination was illegal, the gender-segregated want ads in question were not entitled to non-commercial First Amendment protections because they facilitated illegal employment discrimination. *Pittsburgh Press*, 413 U.S. at 389.  For the same reason, Mayday's speech is not entitled to heightened scrutiny because it openly and brazenly facilitates an illegal drug transaction, which *Pittsburgh Press* says is not entitled to any protection at all let alone heightened scrutiny.  Per *Pittsburgh Press*, Mayday's First Amendment interest "is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."  *Id.*  Thus, *Pittsburgh Press* does not so readily permit Mayday's speech to be classified as non-commercial and subjected to heightened scrutiny as this Court concluded.

Nor does the alleged greater specificity of the ordinance in question in *Pittsburgh Press* render that decision "not . . . particularly instructive" here. Doc. 51 at 34-35.  The statute in question, SDCL 22-17-5.3, contains an explicit prohibition on "advertis[ing]" for any "article or thing . . . intended for producing an abortion," or "drug, [or] medicine . . . for producing an abortion,"

21

that is sufficiently clear on "when a person is alleged to have aided in the doing of the act declared unlawful by the statute" that *Pittsburgh Press*'s relevance cannot be so lightly disregarded.

The Court also reads *Bigelow* too narrowly simply because it did not decide "the precise extent" that states may regulate or prohibit advertising of illegal activity, and because *Bigelow* found the speech commercial.  Doc. 51 at 38-39.  The fact that *Bigelow* does not decide "the extent to which constitutional protection is afforded commercial advertising under *all* circumstances" is not reason to dismiss the case entirely—particularly when Defendants have supplied so many other authorities (*Williams, Hansen, Al-Timimi, Conant, Arthur*) which help infill the "extent" of constitutional protections afforded advertisements of illegal activity possibly left unaddressed in *Bigelow*.  *Bigelow*, 421 U.S. at 826 (italics added).  *Bigelow* itself is abundantly clear that advertising that "further[s] a criminal scheme" in a state, as Mayday's very obviously does in South Dakota, is not protected.  *Bigelow*, 421 U.S. at 828.  *Bigelow* is also clear that speech like Mayday's is "commercial" in that "it relate[s] to a commodity or service" that is available from out-of-state suppliers.  *Bigelow*, 421 U.S. at 828.

Per *Bigelow*, the "court cannot escape the task of assessing the First Amendment interest at stake and weighing it against the public interest served by the regulation" simply by labeling Mayday's "speech" as non-commercial because there is arguably an incidental speech component to essentially transactional speech.  *Bigelow*, 421 U.S. at 826; *Becerra*, 585 U.S. at 769.  As

22

in *Bigelow*, "the task of balancing the interests at stake here was one that should have been undertaken" by the Court rather than simply labeling Mayday's speech as "non-commercial" based on *dicta* that the "extent" of the decision does not purport to address "all circumstances." The circumstances of *Bigelow* and this case are sufficiently similar—they both involve advertising abortion services—to be clear enough that advertising abortion services within a state where abortion is illegal, as Mayday does, falls within the police powers of that state that the Court should not have simply dismissed it out of hand.

Finally, the Court refuses to find *James* "instructive" in connection with whether "Mayday's speech is integral to criminal conduct" because "[t]here is no language in *James* specifically addressing the legality of abortion reversal pills." Doc. 51 at 39. First, the *James* Court certainly would have mentioned that the pills were illegal, and analyzed the case much differently, if they were. Second, giving Mayday the benefit of the doubt regarding the legal status of the pills in New York fails to hold Mayday to its burden of proving a likelihood of success on the merits. It was Mayday's burden to prove that the abortion reversal pills were illegal if it wanted to contest that point of *James*, but it did not (and could not because, being based in New York, Mayday knows full well that the pills are legal there). To find Mayday's speech *James*-protected when the pills in question in that case were not illegal, and the speech in question in that case was not even arguably integral to criminal conduct, reads *James* too favorably to Mayday's benefit.

23

The Court does not give *Pittsburgh Press*, *Bigelow*, and *James* their due legal and factual force or weight based on distinctions that are without a difference as they relate to this case.  Meanwhile, it takes no such pains to explain why Mayday's other principal authorities—*Matsumoto* and *Welty* (not to mention *Williams*, *Hansen*, *Al-Timimi*, *Conant*, and *Arthur*)—do not fully support the State's position.  The Court glosses over these facts, as well as findings from Mayday's own authorities that speech that "induces" a woman to obtain an illegal abortion is "speech integral to criminal conduct."  *Matsumoto v. Labrador*, 122 F.4th 787, 813 (9th Cir. 2024).  Mayday's website induces women to obtain illegal abortion pills and illegal abortions by connecting buyers with sellers in two clicks of a mouse.  "What do you need?" is a flat-out inducement to click on "abortion" to buy abortion pills from one of Mayday's "trusted" pill merchants . . . and testimony from Mayday saying it is not simply is not credible.  Falsely telling women that it's all OK, implying that the transaction is legal because of "shield laws" in other states, is another way of inducing them to consummate the transaction.

The Court also ignores a finding from Mayday's own authorities that a "state may constitutionally punish speech made in direct furtherance of in-state abortions."  *Welty v. Dunaway*, 791 F.Supp.3d 818, 831 (M.D. Tenn. 2025).  "What do you need?" is in direct furtherance of supplying women with abortion pills via Mayday's links to merchants on its site.  Neither *Welty* nor the speech integral exception require Mayday to sell, dispense, or distribute abortion drugs; it is enough for the speech integral exception to apply that

24

Mayday speaks "in direct furtherance of in-state abortions" – which it plainly does while also providing the means to consummate such transactions. The Court relies too much on what Mayday says rather than what it does. The facts speak for themselves here, and Defendants are likely to succeed on the merits.

### D. HB 1274 is Inapplicable to Turbak Berry

Challenges to a statute on First Amendment grounds must be based on "realistic scenarios" that the law will suppress or deter protected expression. *Students for Life v. Jackley*, 746 F.Supp.3d 668, 688 (D.S.D. 2024) (quoting *Harrington v. Strong*, 363 F. Supp. 3d 984, 1004 (D. Neb. 2019)). Interpreting or applying SDCL 22-17-5.3 to criminalize Turbak Berry's simple "wearing [of her] Mayday Health sweatshirt" is facially unrealistic. The challenged statute, SDCL 22-17-5.3, is strictly limited to "advertis[ing]" in connection with providing "drug[s]" "for purposes of an unlawful abortion" or "for producing an abortion" in South Dakota.

In a perplexing turn of events, while the Court was dismayed with the State's proffer of intent on the part of Mayday because it did not "not sell, handle, provide, or offer abortion pills for sale," Doc. 51 at 27, 33, 36, it refused to apply the very same reasoning to Turbak Berry. Doc. 18-19. Instead, it found that because the messaging was "markedly similar to the message on Mayday's gas station placards" that the statute was applicable to her. *Id.* at 18.

25

The Court's view ignores the fact that the two parties are not similarly situated.  Turbak Berry testified that she has no place in the supply chain and agreed that she was simply expressing advocacy and support for Mayday.  On the other hand, the State has shown that Mayday has inserted itself into the supply chain and that by doing so, it has crossed the line of mere advocacy into facilitation.  The key factor here is intent—the same intent the Court refused to acknowledge on the part of Mayday but so freely affords to Turbak Berry.

Compounding this error, the Court also placed undue emphasis on the word "person," in SDCL 22-17-5.3, a fact that was not in dispute, but failed to analyze the word "advertise" a fact that was in dispute as it relates to Turbak Berry.[7]  Doc. 51 at 19.  The State submitted that the word "advertise" in the context of SDCL 22-17-5.3 means "to present (something or oneself) to the public in a way that is intended to attract customers."  Doc. 17-18.  This definition went uncontested; yet the Court declined to apply or even analyze the issue.   Defendants have demonstrated a likelihood of success on the merits regarding this issue on appeal.

## 2. Irreparable Injury to the State Absent a Stay

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Knutson v. AG Processing, Inc.*, 302 F. Supp.

---

7.    As the Court acknowledged, there was no dispute as to Mayday whether their speech constituted an advertisement.  Doc. 51 at 27.

2d 1023, 1036 (N.D. Iowa 2004) (quoting *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996)). "Therefore, to constitute irreparable injury, the injury must be 'both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir.1986)).

It is the Defendants' responsibility to protect South Dakotans and enforce the laws of the State of South Dakota. Mayday Health's advertisements imply that abortion pills can be legally mailed into the State. Defendants cannot simply sit idle while an advertiser continues to promote illegal conduct within the state.

More importantly, South Dakotans face immediate and dire consequences resulting from the solicitation and facilitation of the sale of abortion pills that are flowing into the State. The injury, loss, or damages suffered include, but are not limited to, side effects, hemorrhaging, and infections from ingesting abortion pills that may result in serious injury or death (Hearing Ex. EE and FF); women taking abortion pills and being told by the abortion pill merchants that they should keep their abortions secret and not seek follow-up medical care relating to abortion procedures for fear they might "get in trouble," thereby reducing the chances that women will seek medical care for adverse reactions, side effects, hemorrhaging, or infections (Hearing Ex. T); and loss of life or injury to teenaged children who are specifically instructed how to surreptitiously obtain medical abortions without their parents knowledge or consent, leaving the parents unable to monitor their teenage children for adverse reactions (Hearing Ex. Z).

### 3. Substantial Injury to Mayday

Initially, a stay causes no substantial injury to Mayday because it has already agreed to not advertise in South Dakota pursuant to the terms of the agreement settling the deceptive acts and practices claim. Doc. 51 at 20. Nor does a stay significantly infringe on Mayday's First Amendment right to advocate on behalf of abortion pills because Mayday "has the full panoply of protections available to its direct comments on public issues" even if a stay is entered. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68 (1983). The only component of Mayday's "speech" affected by a stay is its advertising on behalf of commercial transactions, and, as observed in *Bolger*, "there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Bolger*, 463 U.S. at 68.

### 4. Public Interest

Halting the advertisements and the flow of abortion pills into the State protects South Dakotans from any potential injury or death that may result. For example, a teenaged child could be saved who may have otherwise followed Mayday Health's instructions and surreptitiously performed an at-home medical abortion without informing their parents and then dies of septic shock because their parents were not aware of the abortion pills their child had ingested. The same goes for the woman encouraged not to seek follow-up medical care for fear of "getting in trouble" according to the advice given by Mayday Health's "trusted websites and partners." And finally, it benefits the

28

State to simply shut down bad actors who are knowingly advertising illegal services.

## CONCLUSION

Coming full circle, the Federal Government may constitutionally regulate the advertisement of crime-inciting materials through the mail, particularly that which advertises information about "procuring or producing of abortion." 18 U.S.C.A. § 1461; *see also Smith v. U.S.*, 97 S. Ct. 1756, 431 U.S. 291, 52 L. Ed. 2d 324; *U.S. v. Reidel*, 91 S. Ct. 1410, 402 U.S. 351, 28 L. Ed. 2d 813, *rehearing denied* 91 S. Ct. 2223, 403 U.S. 924, 29 L. Ed. 2d 703; *Roth v. U.S.*, 77 S. Ct. 1304, 354 U.S. 476, 1 L. Ed. 2d 1498, *rehearing denied* 78 S. Ct. 8, 355 U.S. 852, 2 L. Ed. 2d 60; *U.S. v. Extreme Associates, Inc.*, 431 F.3d 150 (3d Cir. 2005), *cert. denied* 126 S. Ct. 2048, 547 U.S. 1143, 164 L. Ed. 2d 806; *U.S. v. Gantzer*, 810 F.2d 349 (2d Cir. 1987); *U.S. v. Heyman*, 562 F.2d 316 (4th Cir. 1977); *U.S. v. Slepicoff*, 524 F.2d 1244 (5th Cir. 1975), *rehearing denied* 526 F.2d 1407, *cert. denied* 96 S. Ct. 2215, 425 U.S. 998, 48 L. Ed. 2d 824; *Schindler v. U.S.*, 221 F.2d 743 (9th Cir. 1955), *cert. denied* 76 S. Ct. 310, 350 U.S. 938, 100 L. Ed. 819.  The Federal Government may do so even though it has no nationwide prohibition on abortion.

Yet when the Court reviewed the same concept as it applied to the State, which very much has a prohibition on both the advertisement and procurement of abortion pills to induce abortion within the State's borders, it found inapposite.  It did so by simply distinguishing that the Comstock Act applies to advertisements sent through the mail.  Doc. 51 at 31 n. 5.  The

Federal Government clearly has no greater interest in regulating advertisements sent by the mail, and which does not touch on an illegal activity, than South Dakota does in regulating any advertisement within its borders that very much do implicate illegal conduct.  If the principle of federalism still exists, such a conclusion cannot stand.  Defendants respectfully request the Court enter a stay in this matter pending appeal.

Dated this 3rd day of August, 2026, Pierre, South Dakota.

/s/ Amanda J. Miiller
Amanda J. Miiller
Deputy Attorney General
1302 East SD Highway 1889, Suite 1
Pierre, South Dakota 57501-8501
Telephone: (605) 773-3215
Email: Amanda.Miiller@state.sd.us

CERTIFICATE OF SERVICE

I hereby certify I electronically filed the foregoing with the Clerk of Court for the United States District Court for the District of South Dakota, by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Amanda Miiller
Amanda Miiller
Deputy Attorney General